Andrew James HILL, Libellant,

v.

AMERICAN PRESIDENT LINES, LTD.,
Respondent and Impleading Libellant,

v.

UNITED STATES of America
and
Whitehall Terminal Corporation,
Impleaded Respondents.

No. 8095.

United States District Court
E. D. Virginia,
Norfolk Division.

May 23, 1961.

L. David Lindauer, Portsmouth, Va., for libellant.

John W. Winston, Norfolk, Va., for American President Lines, Ltd.

Alan Raywid, Dept. of Justice, Washington, D. C., for the United States.

William B. Eley, Norfolk, Va., for Whitehall.

WALTER E. HOFFMAN, District Judge.

As a consequence of serious and permanent injuries sustained by the libellant, Andrew James Hill, a longshoreman employed by Whitehall Terminal Corporation, this action was instituted against American President Lines, Ltd., the owner and operator of the SS Lone Star Mariner, alleging negligence and unseaworthiness.

On November 5, 1958, libellant was a member of a stevedoring gang employed in loading a quantity of pipe in the No. 4 hatch under a space charter agreement between the vessel's owner and the United States. The Government agreed to furnish its own labor and load the cargo of pipe. In turn, the United States entered into a written contract with Whitehall Terminal Corporation, the expert stevedore, for the latter to supply the equipment and provide the necessary personnel to accomplish the loading of the quantity of twenty foot pipe. Upon the institution of the action against American President Lines, the shipowner, after calling upon the United States and Whitehall to take over the defense and assume the liability, if any, impleaded the space charterer and stevedore under Admiralty Rule 56, 28 U.S.C.A., alleging contracts of indemnity. If the libellant is entitled to recover from the shipowner, it is abundantly clear that the ultimate liability must rest upon the stevedore, Whitehall Terminal Corporation, the employer of libellant. The United States, pursuant to its indemnity agreement with the stevedore, filed a cross-claim against Whitehall seeking the recovery of attorney's fees, costs and expenses incurred in the defense of the action irrespective of the result, and alleging that, if liability is imposed upon the United States, the full amount of any judgment should be paid by Whitehall.

Libellant was in the lower hold assisting in placing the pipe into the No. 4 hatch. Between five to ten drafts of pipe had been loaded into the hatch without difficulty. While a draft of pipe was being lowered into the hatch, the pipes broke loose from the sling and tumbled into the lower hold, striking libellant who was in the offshore corner and away from the square of the hatch. There is no negligence attributable to libellant.

The pivotal question for determination is whether there was any unseaworthiness of the vessel and its equipment. While negligence of the officers of the ship is also alleged, it is plain that any recovery on this theory does not merit

discussion. The shipowner, the space charterer, and stevedore each contends that the sole proximate cause of the accident was the negligence of one or more longshoremen employed by the stevedore, and that libellant's only recourse is under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., compensation benefits and medical payments having been previously paid by Whitehall's compensation insurance carrier in the total sum of $5,-070.85.

The pipes, some of which were in bundles and others loose, were removed from the dock with the assistance of the Burton [1] winch, brought over the side of the vessel, and then, aided by the up-and-down winch guided to the square of the hatch, where the up-and-down winch took over the primary duties and the Burton operator guided the draft to keep it from striking the sides of the hatch. The draft in question consisted of approximately fifty separate sections of pipe, weighing in the aggregate from three to three and one-half tons. Two longshoremen, Jones and Epes, operated the winches, with Jones stationed at the up-and-down boom and Epes operating the Burton winch. Epes died on some date prior to the trial.

Libellant's main contention is that two *twenty* foot running hook wires were used by the slingers, whereas, according to libellant, two *thirty* foot wires were required to make the load safe. These wires ran from a hook at the end of the boom rigging, and were then separately placed at a point approximately three feet from the ends of the draft of pipe. The length of these running hook wires only permitted one wrap around the pipe. With the use of thirty foot wires it would have been possible to make two complete wraps around the pipe, thus making the load more secure. It is also suggested by libellant's expert that a "spreader" could be placed between the two twenty foot wires, the effect of which would remove the strain from that portion of the wire around the pipe and prevent any slippage.

Disposing of the theory that a "spreader" could be used effectively, it is sufficient to state that this method is never used in loading pipe aboard a vessel. Indeed, libellant's expert, a thoroughly qualified naval architect with some experience in shoreside rigging, concedes that he has never seen the "spreader" used in this manner. Moreover, while the pipe could undoubtedly be lowered into the hold more safely by the use of the "spreader", there would be considerable danger when the pipes were directed to their final resting place in the hold of the vessel away from the square of the hatch. To brand loading equipment as unseaworthy merely because an expert conceives an idea which is untried and untested would impose liability upon the shipowner extending far beyond the rule of absolute nondelegable duty to furnish *reasonably* safe equipment and appliances.

It is conceded that the stevedore rigged the gear, placed the wires around each bundle of pipe, operated the winches, and, in short, had complete control over all loading operations. There is no evidence that the winches or booms were defective. Libellant contends that the running hook wires used by the slingers in securing the draft were unsafe and unseaworthy in that they were too short for the intended purposes, and under the doctrine established in Alaska S. S. Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, and Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, the shipowner is liable for unseaworthiness even though the equipment was selected, owned and controlled by the stevedore.

The surviving winch operator, Jones, described the draft as being tilted "approximately five or six inches" as she came over the square of the hatch. When the draft was between the coaming and the 'tween deck, Jones observed the forward wire start to slide toward the center of the load, thus causing the pipes to slide. He denies that the draft struck the side of the hatch or otherwise hit

1. Generally referred to as the burden winch.

the 'tween deck before the wire started to slip. The same type of rigging had been used on prior loads that morning without any difficulty. He saw the gang boss, Taylor, turn the load crosswise the hatch and initially guide it as the load entered the hatch. No longshoreman was stationed in the lower 'tween deck to straighten the load. Jones testified that the up-and-down winch maintains the same speed during the lowering operation, but the Burton operator is sometimes required to vary his speed in order to properly guide the draft and keep it from striking the side of the hatch. If the Burton operator turned the draft loose, it would cause the same to swing. According to Jones, it was the side nearest the other winch operator, Epes, which initially tilted downward. Jones is the only witness who referred to any perceptible tilt of the load as it came over the side of the vessel and into the square of the hatch.

The physical facts and overwhelming weight of the evidence point to some contact of the pipes with the coaming and deck of the upper 'tween deck. Tags from the pipes were found on the port or inboard side of this deck; fresh scratch marks were noted on the coaming; and several fresh marks were "dug" into the deck about three feet from the hatch. Whether these marks were caused by the load striking the upper 'tween deck prior to coming loose from the slings is problematical.

There is some intimation that the pipes were covered with a substance which was slippery. Undoubtedly they were covered with a preventative to avoid rust, but the credible evidence does not reflect that there was any wet, damp, or slippery substance on the pipes; and as the slinger, Battle, described the pipe, it had a "waxy coating", but was not wet or greasy.

Libellant's expert referred to the single wrap sling as a "highly unsafe" practice employed in loading pipe, but he likewise noted that a tilt of the load to the extent of five or six inches would be of little or no consequence and would not ordinarily cause a wire to slip or the pipes to fall. The expert related that he had seen pipe fall from a sling on prior occasions where twenty foot wire was used and, while he had never observed a "spreader" used, that the double wrap had been employed with thirty foot wire around the pipes. The longshoremen, while admitting that the twenty foot wire was commonly used on the East Coast in loading pipe approximately twenty feet in length, suggested that this was not a "safe" form of rigging; they point out that iron against iron will slip, and intimate that dunnage should be placed between the wires and pipe to prevent slippage.

The preponderance of the evidence points to the fact that the method used on the day of the accident (in slinging pipe twenty feet in length) has remained the same for many years. When longer pipe is being lowered into the hold, it is necessary to use the so-called "double wrap", as the pipe cannot then clear the sides of the hatch and it is essential that one end of the pipe be considerably lower than the other end. But where the hatch opening was 40' x 30', as in this case, there was no requirement to lower the pipes on an angle.

There is no contention that the ship's equipment was defective or not such as was customarily used. The same can be said as to the equipment furnished by the stevedore. Even using the double "wrap" or "loop", the danger still exists if the draft strikes the side of the hatch, although undoubtedly the danger would not be as great as in the use of twenty foot wire.

■■ The credible evidence does not support the view that the proximate cause of the accident and resulting injury was due to any unseaworthiness of the vessel or its equipment, including, of course, the equipment provided by the stevedore. It is, therefore, unnecessary to consider the contentions advanced by the respondent and impleaded respondents relating to the absence of any evidence touching upon the historical use of slings. Assuming, without de-

ciding, that the Court may take cognizance of normal loading operations and the necessity of slings in furtherance thereof, we nevertheless do not reach a point of finding any negligence on the part of the American President Lines, or its employees, nor do we find any unseaworthiness as contended. The reasonable probabilities point to the conclusion that the load of pipe, secured by twenty foot wire as was customarily used, struck the side of the hatch while being lowered into the hold, thus causing the load to fall. If the "method of operation" was the proximate cause of the accident, as the Court so finds to be the only reasonable conclusion, this is neither unseaworthiness nor negligence as the "method of operation" was under the sole control of the stevedore. Unlike Holley v. The Manfred Stansfield, D.C., 186 F.Supp. 212, where the cargo was already aboard the vessel and the unseaworthy condition was created by the longshoreman, the load of pipe was in the process of being lowered into the hold of the vessel. The condition of unseaworthiness did not, in fact, exist. Carabellese v. Naviera Aznar, S. A., 2 Cir., 285 F.2d 355. Until we reach the point of extending unseaworthiness and making the vessel owner automatically liable in cases where the owner has contracted for the loading of a customary cargo in a customary way, with no defect of ship's gear being shown and no showing that customary equipment was not reasonable, liability cannot be imposed merely because an accident occurred. Phipps v. N. V. Nederlandsche Amerikaansche S. M., 9 Cir., 259 F.2d 143, 146.

As the Second Circuit said in Carabellese [285 F.2d 359]:

"But we know of no case that has imposed absolute liability on the owner where the alleged danger was inherent in the cargo and this was still in the course of being loaded. Hence the question posed is whether the owner warrants to longshoremen not simply a safe place in which to handle cargo but cargo which is safe to handle."

Closer in point is Arena v. Luckenbach Steamship Co., 1 Cir., 279 F.2d 186, certiorari denied 364 U.S. 895, 81 S.Ct. 222, 5 L.Ed.2d 189, pertaining to the loading of rolls of printing paper, a particularly unstable item of cargo. Plaintiff was injured when a loading board tipped and spilled rolls of paper into the hold. In upholding a directed verdict for the defendant, the court pointed out that, after the load was steadied, it started into the hatch and the rolls dropped off the loading board. There was no evidence that any equipment failed, and no one testified as to what caused the upset.[2] It is said that the defendant, as in this case, had nothing to do with the loading of the vessel and that liability, if any, must rest upon proof of defective or improper equipment, as the improper loading is not chargeable to the shipowner. More important, however, is the statement that a vessel is not unseaworthy simply because the improper type of equipment was used by someone else unless, of course, it appears that the proper type of equipment was unavailable. In the instant case the *thirty* foot wires were admittedly available for use as a part of the stevedore's regular equipment. Thus, even if we assume that *thirty* foot wires should have been used, it does not necessarily follow that liability attaches. As heretofore mentioned, the evidence is insufficient to support a finding that *thirty* foot wires should have been used.

Libellant relies upon Stark v. American Dredging Co., D.C., 66 F.Supp. 296, in which short spuds were used which were inadequate to secure the dredge to the river bed, whereas longer spuds were available at the hands of the shipowner. It was, therefore, the shipowner who created the dangerous place to work. To this extent, at least, the authority is distinguishable from Arena v. Luckenbach Steamship Co., supra. In Stark,

2. In the present case the winch operator attributes the fall of the pipe to the tilt of five to six inches, but libellant's own expert states that this would not have caused the fall.

the pivotal question was negligence and not unseaworthiness.

There is nothing in Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, which is in conflict with what has been said. The decision *per curiam* merely reverses the case without an opinion. The reversal apparently turned upon the treatment of Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, decided April 5, 1954, whereas the opinion of the Third Circuit in Rogers was handed down on June 24, 1953. See: 205 F.2d 57.

Finding that there is no liability on the part of American President Lines for negligence or unseaworthiness, the libel will be dismissed. We turn, therefore, to a discussion of the claims of American President Lines and the United States of America against Whitehall Terminal Corporation for expenses and attorneys' fees by way of indemnity. That such items have frequently been allowed to an indemnitee where liability is imposed is well settled. Shannon v. United States, 2 Cir., 235 F.2d 457; A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 2 Cir., 256 F.2d 227; B. & G. Electric Co. v. G. E. Bass & Co., 5 Cir., 252 F.2d 698; General Accident Fire & Life Assur. Corp., Ltd. v. Smith & Oby Co., 6 Cir., 272 F.2d 581; Frommeyer v. L. & R. Construction Co., 3 Cir., 261 F.2d 879, 69 A.L.R.2d 1040; Chesapeake & Ohio Ry. Co. v. Bailey Production Corp., D.C., 163 F.Supp. 666; Commonwealth Public Service Corp. v. Town of Bluefield, 167 Va. 82, 187 S.E. 521; Hiss v. Friedberg, 201 Va. 572, 112 S.E.2d 871; General Electric Co. v. Mason & Dixon Lines, D.C., 186 F.Supp. 761; Holley v. The Manfred Stansfield, D.C.E.D.Va., 186 F.Supp. 805.

The United States entered into an express contract with Whitehall Terminal providing, in substance, that Whitehall, the contractor:

"(2) shall be responsible for and shall hold the Government harmless from any and all loss, damage, liability, and expense for cargo vessels, piers, or any other property of every kind and description, whether or not owned by the Government, or bodily injury to or death of persons occasioned either in whole or in part by the negligence or fault of the Contractor, his officers, agents or employees in the performance of work under this contract.

\* \* \* \* \* \*

"(f) The Contractor shall, at its own cost and expense, defend any suits, demands, claims, or actions, in which the United States might be named as a co-defendant of the Contractor, arising out of or as a result of the Contractor's performance of work under this contract, whether or not such suit, demand, claim or action arose out of or was the result of the Contractor's negligence. This shall not prejudice the right of the Government to appear in such suit, participate in defense, and take such action as may be necessary to protect the interest of the United States."

Under this express contract the United States, having elected to appear and defend by its attorneys, seeks reimbursement from Whitehall for the reasonable value of attorneys' fees and expenses. American President Lines, under its implied contract of indemnity, wishes to be reimbursed by the United States and Whitehall for its reasonable attorneys' fees and expenses.

Where the original respondent (or defendant) is successful in resisting the claim of libellant (or plaintiff), a different situation is presented. Undoubtedly contracts may be so worded as to make an indemnitor liable to his indemnitee irrespective of the outcome of the litigation which gives rise to the original action. This Court has previously held in Fox v. The S. S. Moremacwind, 182 F.Supp. 7, affirmed without discussing the question, 4 Cir., 285 F.2d 222, that no liability attaches to the indemnitor for expenses and attorneys' fees unless the indemnitee is held for damages

due the libellant. A contrary rule is reached in Gonzales v. Pennsylvania R. R. Co., D.C.S.D.N.Y., 183 F.Supp. 779. The United States, while contending that it is entitled to expenses and attorneys' fees in this action, successfully urged the opposite view in Matson Navigation Co. v. United States, D.C., 173 F.Supp. 562. The point apparently has never been determined by an appellate court.

 The question may well turn upon the willingness of the indemnitee to step aside and turn over the complete control of all litigation to the indemnitor. Frequently we have, as in this case with respect to American President Lines, an invitation extended to the indemnitor to take over the defense of the action, but if the indemnitor declines to accept, the indemnitee is then faced with the problem of relying upon his contract of indemnity or assisting in resisting the claim of the party having instituted the action. Absent a willingness to abandon the defense of the original action, and lacking a specific contractual agreement to pay expenses and attorneys' fees regardless of the outcome of the original action, this Court perceives no reason, as a matter of discretion at least, why the stevedore should now be burdened with such items of expense when the stevedore did not breach the terms of any express or implied contract, and has otherwise protected itself, as required by law, under the Longshoremen's and Harbor Workers' Compensation Act. The employment of counsel by American President Lines and the United States was not a direct and necessary consequence of the breach of contract by Whitehall.

It does appear that, in cases in which the original action results in the indemnitee being held legally liable, the United States may properly claim reasonable attorneys' fees, costs and expenses. Amato v. United States, D.C., 167 F. Supp. 929. The general theory is that the wrongdoer should be held ultimately liable for the entire loss. But where there is no party legally responsible to the original actor, it would appear more reasonable to conclude that attorneys' fees, costs and expenses are, in the normal case, merely an expense of doing business. The claims for such items of expense are disallowed.

A decree may be presented in accordance with the views expressed herein.