[Civ. No. 27907.    Second Dist., Div. Four.    July 27, 1964.]

CARMINE VITTONE, Plaintiff and Respondent, v. AMERICAN PRESIDENT LINES, Defendant and Appellant.

Robert Sikes for Defendant and Appellant.

George E. Shibley, Margolis & McTernan and John T. McTernan for Plaintiff and Respondent.

BURKE, P. J.—Plaintiff, a longshoreman, was injured while engaged in discharging cargo from aboard the SS President Johnson, a vessel owned and operated by defendant American President Lines. He was employed by the Associated-Banning Company, a stevedoring corporation, an

independent contractor performing the unloading operations for defendant. Plaintiff brought an action sounding in negligence and unseaworthiness of vessel under the general maritime law and a jury found in his favor and awarded $50,000 damages against defendant American President Lines for personal injuries suffered by plaintiff. Defendant appeals from the judgment and the appeal involves only the unseaworthiness cause of action and asserted errors of the trial court in giving and refusing instructions pertaining to that issue.

The evidence adduced at the trial was substantially without conflict and a brief summary of it, viewed from the point of view of the prevailing party, follows.

The alleged unseaworthiness of vessel is related to the lack of dunnage between the layers of large steel pipe, their cantline stowage, the pipe being stowed metal to metal, upper tiers resting in the valleys of the lower tiers, and the inadequacy of the gear used in a pickup operation incidental to the discharge of the pipe. Ordinarily, dunnage, consisting of wood planks, is inserted between the layers of pipe in a cargo to permit the ready encirclement of each pipe by a choker line for removal by lifting from the hold by crane operation. Without dunnage, it is necessary to perform a preliminary pickup operation wherein one end of each pipe is lifted about 2 feet, the attending longshoremen then placing a 4-inch by 4-inch timber under the pipe, upon which the pipe is then lowered. It is then free from the other pipe on which it has rested and a choker line can be applied to it and the pipe lifted from the hold.

Normally four pipes are lifted in the preliminary operation at one time and again lowered, which was being done in the instant case by using a plasterboard bridle which had four hooks on it. When so lifted the pipes are moved out from the wing or side of the hatch to the center of the hatch and lowered on the 4-inch by 4-inch blocks. The plasterboard bridle is attached to a "blacksmith" from which run the cables to the cargo booms through a pulley and down onto the power driven winch drum. At the time of the accident here involved the four pipes had been lifted and plaintiff had picked up a 4-inch by 4-inch block and was trying to place the block under the pipe. When he did so one of the pipes slipped from its hook, hit the 4-inch by 4-inch block, and it in turn struck plaintiff, breaking his jaw and causing other serious injuries.

The plasterboard bridle method of discharging pipe was contended to be an unsafe method and complaints were made to the supervising stevedore personnel prior to the accident. No complaint was made to defendant ship's personnel. The danger of such method results from the fact that there is no purchase or grip between the metal pipe and metal hook. A safe method, in more common use in the Los Angeles Harbor area, for picking up 40-foot pipes, as here, was the sling and block pickup which involved inserting 4-inch by 4-inch blocks of 4 to 6 feet in length into each pipe (the pipes here were a little over a foot in diameter) and having a choker-sling wrapped around the protruding ends of the blocks and then lifted. When so lifted pressure is put on the block and it binds against the inside of the pipe preventing the pipe from slipping and falling. There is no metal to metal contact. The plasterboard bridle method is a faster method, however, and enables the stevedoring company to get more production. All the materials necessary to use both methods were available on board the vessel and in good condition at the time plaintiff was injured. All employees engaged in the unloading operations were longshoremen none a member of the ship's crew; the longshoremen took no orders from the ship's officers but received their supervision from the hatch boss, foreman for the stevedoring company. After the accident the longshoremen changed to the safe choker-sling method, with wooden blocks, to unload the remaining pipe.

Accordingly, the issue on appeal is whether the availability of proper gear on the vessel for a safe method of unloading avoids liability for the defendant shipowner, or the use of the improper gear, the plasterboard bridle method, fixes liability on defendant for the injuries sustained.

The evidence is clear and it is agreed that negligence might have been deemed by the jury to have been established, both in the method of cantline stowage used by defendant, without dunnage, and in the selection by the stevedoring company of the more hazardous method of performing the preliminary pickup operation which caused the accident. However, since the jury's verdict may have been based on the theory of unseaworthiness, the judgment must stand or fall on the issue of whether or not the vessel was, in fact and in law, unseaworthy and whether this issue was submitted to the jury on proper instructions. Plaintiff contends that if unsafe gear was used, even though safe gear was made available by the ship and the selection was made by an independ-

ent contractor, the vessel was legally and factually "unseaworthy" and liability attaches to the ship and her owner; defendant contends that the ship becomes unseaworthy under such circumstances only if the safe gear was not made available. The trial court gave an instruction which embodied plaintiff's theory[1] and refused to give three instructions[2] requested by defendant and embodying its theory.

Though the forum herein is the state court of California, the federal maritime laws and decisions are controlling (*Pope & Talbot, Inc.* v. *Hawn*, 346 U.S. 406, 409 [74 S.Ct. 202, 98 L.Ed. 143, 151]; *Reynolds* v. *Royal Mail Lines*, 147 F.Supp. 223, 226). The law does not impose upon a shipowner a duty to provide continuing observation and immediate supervision of work being done by a qualified independent stevedoring contractor in unloading ordinary cargo (*Knox* v. *United States Lines Co.* 294 F.2d 354). "Unseaworthiness" is explained in *Doucette* v. *Vincent*, 194 F.2d 834, at 837-838 as follows: "Nor is perfection required of shipowners by the maritime law of seaworthiness

---

[1]Plaintiff's Proposed Instruction No. 16, which was given by the trial court, is as follows: "Where in furnishing seaworthy gear and appliances, as I have just defined them, a choice is to be made between different kinds of gear and appliances or different items of same kind, the burden of choosing gear and appliances that are seaworthy is solely upon the shipowner or its representatives. If the gear and appliances selected are not reasonably fit to perform the task assigned to the longshoremen, the shipowner has breached its duty and it makes no difference that other gear and appliances which were reasonably fit were also available."

[2]Defendant's Proposed Instructions, which were refused by the trial judge, are as follows:

DEFENDANT'S JURY INSTRUCTION No. 8

"Where the longshoremen are in sole charge of the unloading operations and are at liberty to select one of a number of methods to do the work and select a method which proves faulty and is the sole cause of the plaintiff's injury, then the plaintiff may not recover damages against the shipowner."

DEFENDANT'S JURY INSTRUCTION No. 11

"A vessel is not rendered unseaworthy merely because the improper type of equipment was used by the longshoremen unless it also appears that the proper type was unavailable."

DEFENDANT'S JURY INSTRUCTION No. 12

"The mere fact that a stevedoring company may have made negligent use or negligent choice of equipment does not of itself render the vessel unseaworthy and you shall be guided in your determination of unseaworthiness in this case by the instructions which have been given to you thereon."

for generally stated it is the shipowner's duty under that law to provide a vessel sufficient, that is reasonably adequate, in materials, construction, equipment, stores, officers, men and outfit for the trade or service in which the vessel is employed.''

In *The Osceola,* 189 U.S. 158, at page 175 [23 S.Ct. 483, 47 L.Ed. 760, 764], the obligation of the shipowner is stated as follows: ''That the vessel and her owner are . . . liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship.''

To sustain the trial court, plaintiff relies principally upon the case of *Mahnich* v. *Southern S.S. Co.* (1944) 321 U.S. 96, 103 [64 S.Ct. 455, 88 L.Ed. 561, 567], in which the Supreme Court stated: ''We have often had occasion to emphasize the conditions of the seaman's employment, see *Socony-Vacuum Oil Co.* v. *Smith, supra,* 305 U.S. 430, 431 [59 S.Ct. 262, 83 L.Ed. 269, 270], and cases cited, which have been deemed to make him a ward of the admiralty and to place large responsibility for his safety on the owner. He is subject to the rigorous discipline of the sea, and all the conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers. These conditions, which have generated the exacting requirement that the vessel or the owner must provide the seaman with seaworthy appliances with which to do his work, *likewise require that safe appliances be furnished when and where the work is to be done.* [Italics added.] For, as was said in *The Osceola, supra* [citation], the owner's obligation is 'to supply and *keep in order* the proper appliances appurtenant to the ship.' (Italics supplied.) It is not enough that the 'Wichita Falls' had on board sound rope which could have been used to make the staging seaworthy, if in fact the staging was unsafe because sound rope was not used. [Citations.]''

     A shipowner's liability for injuries caused by gear that is not reasonably fit is ''absolute'' and ''a species of liability without fault.'' (*Seas Shipping Co.* v. *Sieracki* (1946) 328 U.S. 85, 99 [66 S.Ct. 872, 90 L.Ed. 1099, 1107, 1109].)     Such liability is ''nondelegable'' and cannot be escaped by showing it was caused by another or that others contracted to assume the responsibility. (*Crumady* v. *''Joachim Hendrik Fisser''* (1959) 358 U.S. 423, 427 [79 S.Ct. 445,

3 L.Ed.2d 413, 416, 417]; *Crawford* v. *Pope & Talbot, Inc.,* (3d Cir. 1953) 206 F.2d 784; *Thorson* v. *Inland Navigation Co.* (9th Cir. 1959) 270 F.2d 432 [77 A.L.R.2d 825].)

As was held in *Seas Shipping Co.* v. *Sieracki, supra,* the fortuitous circumstances of a ship worker's employment by the shipowner or a stevedore contractor should not determine the measure of his rights. Such a worker performs a function essential to maritime service aboard the ship.

Clearly, we deal here with a very special type of absolute liability. A landowner who employs an independent moving company to remove pipe from his warehouse, while liable for an unsafe condition of the premises themselves, is under no duty to provide the moving gear or to see that only suitable and safe gear is available and used. His liability, if any, in that regard is solely in negligence. The exercise of due diligence by the landowner would relieve him of any responsibility to employees of the independent moving contractor—not so as to the shipowner. ■ Due diligence does not relieve the latter of his obligation to the worker to furnish adequate appliances. (*Carlisle Packing Co.* v. *Sandanger,* 259 U.S. 255, 260 [42 S.Ct. 475, 66 L.Ed. 927, 930]; *The Arizona* v. *Anelich,* 298 U.S. 110, 120 [56 S.Ct. 707, 80 L.Ed. 1075, 1079].)

"If the owner is liable for furnishing an unseaworthy appliance, even when he is not negligent, a fortiori his obligation is unaffected by the fact that the negligence of the officers of the vessel contributed to its unseaworthiness." (*Mahnich* v. *Southern S.S. Co., supra,* at p. 100.)

■ In the case at hand, as in *Strika* v. *Netherlands Ministry of Traffic* (2d Cir. 1950) 185 F.2d 555, the owner's duty is not relieved by the choice of gear made by longshoremen foremen or stevedore company foremen who are likewise engaged in the ship's service. This is made crystal clear in the words of the court in *Crumady* v. *"Joachim Hendrik Fisser,"* 358 U.S. 423, 427 [79 S.Ct. 445, 3 L.Ed.2d 413, 417]: "The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company."

In *Strika* v. *Netherlands Ministry of Traffic, supra,* involving the fall of a hatch cover, injuring a longshoreman, two unsuitable ring bridles were used. Suitable gear was available on the vessel. The court stated: " . . . other 'bridles' were available which could have been used, and which had a single ring with four lengths of wire. These concededly would have

been suitable, and the defendant asserts that their presence made the ship seaworthy, even if they were not used. In answer we need only cite *Mahnich* v. *Southern S.S. Co."* (185 F.2d 555, at p. 556.)

A distinction between the facts of *Mahnich* and *Strika* is noteworthy. In the former the rope used on the staging (a board suspended by ropes at each end) broke and was found to be rotten. Good rope was available and the court held that any negligence in selecting the rope and ordering its use as a part of the staging, or of the boatswain in using it for that purpose, cannot relieve the shipowner of the duty to furnish a seaworthy staging. In *Strika* the gear actually used was not defective but was unsuitable for the purpose for which it was used. Suitable gear was available.

Splicing together the decisions in *Mahnich* and *Strika,* the rule may be stated that the availability of proper equipment does not render a vessel seaworthy if defective equipment (*Mahnich*) or unsuitable equipment (*Strika*) is actually used and results in injury to a seaman or longshoreman.

The facts in the case at hand follow closely the factual situation in *Strika* since the gear used was not defective when used for the purpose for which it was designed, but was unsuitable for the particular use to which it was devoted in this case, and therefore, as to that particular use, rendered the vessel unseaworthy as to the plaintiff.

Defendant asserts that the above quotation from *Strika* is an obiter dictum since the three points involved in the *Strika* appeal do not concern the issue of availability of proper equipment rendering a vessel seaworthy. This contention is without merit. The point with which we are immediately concerned, whether the use of unsuitable (even though nondefective) equipment renders the ship unseaworthy, was present in *Strika* and was largely determinative of the case in the trial court. The jury was asked specifically questions as to whether the equipment was unsuitable for the purpose used and if unsuitable did it cause the injury, which questions they answered affirmatively. In *Mahnich,* whose rule *Strika* followed and extended, the court applied the principle of the duty to "furnish" or "provide" reasonably safe gear, and plaintiff contends in the case before us this requires that the gear be reasonably fit for the particular "use" for which the seaman is called upon to use it. (*Gutierrez* v. *Waterman Steamship Corp.,* 373 U.S. 206 [83 S.Ct. 1185, 10 L.Ed.2d

297]; *Michalic* v. *Cleveland Tankers,* 364 U.S. 325, 328 [81 S.Ct. 6, 5 L.Ed.2d 20, 23]; *The Edith Godden,* 23 F. 43.) Therefore, the availability of sound rope, in *Mahnich,* was held to be "not enough" to relieve the shipowner from liability. This is the crucial point in the instant case as well.

In *Mahnich,* the shipowner did not furnish nor keep in order and available a safe appliance. The workman was not furnished a choice between a safe and unsafe staging and had no alternative but to use the unsafe staging that was provided. Likewise, in the instant case the workman, as distinguished from his employer, the stevedore contractor, had no choice between a safe and unsafe appliance to lift the pipe.

As far as the plaintiff was concerned, as in *Mahnich,* the equipment was selected for use by his superior and for the purpose selected it was unsuitable and therefore defective. Witness this excerpt from *Mahnich* (p. 103): "[The staging] was unseaworthy in the sense that it was inadequate for the purpose for which it was ordinarily used, because of the defective rope with which it was rigged. Its inadequacy rendered it unseaworthy, whether the mate's failure to observe the defect was negligent or unavoidable. Had it been adequate, petitioner would not have been injured and his injury was the proximate and immediate consequence of the unseaworthiness. See *The Osceola, supra.* . . . " In *Mahnich* the particular rope selected for use was " . . . intended for use with the Lyle life-saving apparatus, [and] had never been used." It was cut from a coil which had been stored for two years in the Lyle gun box.

· In the case before us the plasterboard sling was intended for use to load and unload plasterboard and not for the lifting of pipe. We are not here concerned with the responsibilities of the stevedoring company and the shipowner to one another. Such responsibilities and liabilities can be determined in appropriate actions between those parties. We are here concerned only with the shipowner's absolute responsibility to the seaman (and longshoreman) to supply seaworthy gear when and where the work is to be done.

In *De Van* v. *Pennsylvania Railroad Co.* 167 F.Supp. 336, the federal district court had before it a factual situation quite similar to that which exists in the case before us. There, an independent stevedore contractor was engaged in loading a cargo of heavy links of pipe. The court found that the particular cargo hook used in the operation was not reason-

ably fit for the purpose for which it was being used, that if any sway occurred the metal hook could easily slip out of the end of the piece of pipe. The testimony indicated that a hook extending at least 6 inches into the mouth of the pipe was needed for safety reasons. The court concluded that the use of an unsafe cargo hook rendered the ship unseaworthy, thereby making the vessel owner liable to the injured longshoreman. Since the cargo hook was supplied by the contracting stevedore company, it in turn was held liable for breach of its implied warranty in performing the loading in a safe and workmanlike manner and the owner of the vessel was held to be entitled to indemnity against the independent contractor. It is interesting to note that in this decision the shipowner was held liable for the use of unsuitable gear, even though the gear was supplied by the independent contractor and not by the vessel itself.

Similarly, in *Alaska Steamship Co.* v. *Petterson,* 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798], a shipowner was held liable for injuries to a stevedore resulting from unseaworthiness of equipment, even though the equipment was not a part of the ship's equipment but was assumed to have been brought on board by the stevedore's independent employer.

Also, in *Thorson* v. *Inland Navigation Co.,* 270 F.2d 432 [77 A.L.R.2d 825], the shipowner was held liable to a longshoreman for injuries due to aspects of unseaworthiness brought about by acts of a stevedore company or the latter's employees. Part of the particular gear involved was not a part of the ship's gear. (See, also, *Crumady* v. *"Joachim Hendrik Fisser,"* 358 U.S. 423, 427 [79 S.Ct. 445, 3 L.Ed.2d 413, 416].) The extent to which this rule of absolute liability has been held to apply, notwithstanding absence of negligence on the part of the shipowner or its employees, and notwithstanding direct evidence of negligence on the part of third persons directly causing injury, is illustrated by the decision of *Calderone* v. *Naviera Vacuba S/A,* 204 F.Supp. 783. In *Calderone* the shipowner supplied a seaworthy Jacobs ladder which was rigged in place on the vessel for use in loading the vessel from lighters. The ladder was subsequently rendered unseaworthy by acts of the harbor master, who at the time was held to be acting as an employee of the stevedoring company. Notwithstanding these facts, the injured employee of the stevedoring company recovered judgment against the shipowner. No claim was made that the ladder, which was part of the ship's equipment, was defective. The

accident was caused because the ladder had not been properly secured or lashed to the rail and was in that sense unseaworthy. The court stated (p. 790): "Attempts to engraft exceptions upon the doctrine based on (1) the fact that the unseaworthy equipment had been brought aboard the vessel by stevedores, (2) relinquishment of control, (3) the creation of the unseaworthy condition after the vessel left port, or (4) the transitory nature of the unseaworthy condition, all of which, however stated, rest upon concepts of negligence, have been rebuffed by the Supreme Court.[3] Any lingering doubt that the warranty does in fact impose a 'species of liability without fault'[4] was finally put to rest, against vigorous opposition by a minority of the Court, in *Mitchell* v. *Trawler Racer, Inc.*[5] The Court there, in emphasizing that due diligence on the part of the shipowner or lack of actual or constructive knowledge of the unseaworthy condition did not insulate him from liability, noted: '[There is] a complete divorcement of unseaworthiness liability from concepts of negligence.' "[6]

Defendants rely upon several cases, principally *Arena* v. *Luckenbach Steamship Co., Inc.,* 279 F.2d 186, 188, wherein the court stated that "a vessel is not unseaworthy simply because the improper type of equipment was used by someone unless, also, it appears that the proper type was unavailable." In *Arena,* unlike *Mahnich, Strika* or the case before us, there was no evidence adduced showing that the equipment used was either defective or unsuitable for the particular use. Witness the court's statement (pp. 187-188): "Although the burden upon a longshoreman to establish causation is not heavy, there must be some evidence that whatever might be claimed to be a defect in the vessel had some connection with the occurrence. . . . The plaintiff bases his attack principally upon the board. There was no evidence that this particular board was damaged or defective. Nor were its lanyards or nets. The board, with its appurtenances, continued to be used for further loading. Apparently, not even any net lines had been injured." The court concluded, although no

---

[3]See *Mitchell* v. *Trawler Racer, Inc.* (1960) 362 U.S. 539 [80 S.Ct. 926, 4 L.Ed.2d 941]; *Alaska Steamship Co.* v. *Petterson* (1954) 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798].

[4]*Seas Shipping Co.* v. *Sieracki* (1946) 328 U.S. 85, 94 [66 S.Ct. 872, 90 L.Ed. 1099].

[5](1960) 362 U.S. 539, 550 [80 S.Ct. 926, 4 L.Ed.2d 941, 948].

[6]*Ibid.*

witness testified directly what caused the accident to occur, that it was due to improper loading of the bales on the board, but it pointed out: "In any event, the improper loading was not chargeable to the defendant." Clearly, this case has no application to the instant case where there was ample testimony that the equipment used was itself unsuitable and dangerous for the particular use to which it was being put and that its selection and use were the cause of plaintiff's injuries.

Defendant also relies upon *Ezekiel* v. *Volusia Steamship Co.*, 297 F.2d 215, which it asserts is directly in point. In *Ezekiel*, a seaman was chipping rust with a hammer. He was not wearing goggles which he had been repeatedly ordered to wear and a piece of metal struck his eye. The seaman asserted that the boatswain did not furnish goggles as he should have done. The court found that goggles had been issued to each seaman and replacements were available upon request. The court ruled that imprudent action by a seaman's superior is not within the concept of unseaworthiness even though it may be within that of negligence. Thus, *Ezekiel* is also unlike *Mahnich*, *Strika* or the case at hand in that it is not based upon the supplying for use by the plaintiff of either unsuitable or defective equipment but is based upon the shipowner's furnishing suitable gear which the seaman saw fit not to use.

Defendant also cites *Hill* v. *American President Lines, Ltd.* (1961) 194 F.Supp. 885. In that case, an employee of a stevedoring contractor was injured while pipe was being loaded through a hatch in defendant's vessel. Two 20-foot running hook wires were being used to load pipe of 20-foot length. There was some evidence that the load tilted, one of the supporting wires slipped toward the center, the pipes broke loose from the sling, falling into the hold and injuring plaintiff. The court stated: "The preponderance of the evidence points to the fact that the method used on the day of the accident (in slinging pipe twenty feet in length) has remained the same for many years. When longer pipe is being lowered into the hold, it is necessary to use the so-called 'double wrap,' as the pipe cannot then clear the sides of the hatch and it is essential that one end of the pipe be considerably lower than the other end. But where the hatch opening was 40' x 30', as in this case, there was no requirement to lower the pipes on an angle.

"There is no contention that the ship's equipment was

defective or not such as was customarily used. The same can be said as to the equipment furnished by the stevedore. Even using the double 'wrap' or 'loop,' the danger still exists if the draft strikes the side of the hatch, although undoubtedly the danger would not be as great as in the use of twenty foot wire.

''The credible evidence does not support the view that the proximate cause of the accident and resulting injury was due to any unseaworthiness of the vessel or its equipment, including, of course, the equipment provided by the stevedore.'' (P. 888.)

It had been contended in *Hill* that it would have been safer to have used 30-foot wires instead of the 20-foot wires, thus permitting a looping of the wire around the pipe and thereby making the load more secure in the event of tilting. The court found that the reasonable probabilities based upon physical evidence at the scene were that the load of pipe secured by 20-foot wires, as was customarily used, struck the side of the hatch while being lowered into the hold, thus causing the load to fall. The court declared: ''If the 'method of operation' was the proximate cause of the accident, as the Court so finds to be the only reasonable conclusion, this is neither unseaworthiness nor negligence as the 'method of operation' was under the sole control of the stevedore.''

The court specifically found that '' . . . with no defect of ship's gear being shown and no showing that customary equipment was not reasonable, liability cannot be imposed merely because an accident occurred.''

These references to *Hill, supra,* distinguish it from *Mahnich, Strika* and the case at hand. There was no evidence in *Hill* that the gear used was either unsuitable or defective; on the contrary the 20-foot wires were those customarily used for the particular operation.

Of the remaining cases relied upon by defendant, one further case is worthy of comment, *Firemans' Fund Indemnity Co.* v. *United States,* 211 F.2d 773. In that case, there were several methods in common use of holding steel hatch covers in upright or open position so that they would not be likely to be dislodged during loading operations. One of the methods commonly used and found to be safe was through the use of stove bolts. These had been made readily available in close proximity to the hatch. The stevedore contractor did not use the bolts, claiming that at the time he couldn't find them. The hatch was dislodged by cargo falling from a sling

causing injury to the plaintiff. Immediately following the accident the stove bolts were found and the contractor secured the hatch covers. The court found that the culpably negligent method of performing his work was voluntarily and consciously chosen by the stevedore contractor and was voluntarily participated in by the injured longshoreman, notwithstanding that a safe method was at hand. Since a safe method had been provided in close proximity to the hatch, the court held that there was neither unseaworthiness in the vessel nor negligence on the part of its owner. The injury resulted from negligence on the part of the stevedore contractor in not securing the hatch covers. It was not shown that there was anything defective about either the covers, the method of securing them or the equipment made available by the ship. Therefore, there was no unseaworthiness of the vessel.

Thus, in *Fireman's Fund,* as in *Ezekiel,* sound gear was made available by the ship but was not utilized, whereas in *Mahnich, Strika* and the case at hand either defective or unsuitable gear was supplied by the ship and was used, and the fact that sound gear was also made available by the shipowner did not render the ship seaworthy.

We hold that there was no error in the instructions given by the court as to the applicable law and no error in the conduct of the trial.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.