[Civ. No. 30728. Second Dist., Div. One. Feb. 27, 1967.]

ARTHUR FLORES, Plaintiff and Respondent, v. PACIFIC ISLAND TRANSPORT LINES, Defendant and Appellant; THOR-DAHL A/S, Defendant, Cross-complainant and Appellant; CRESCENT WHARF & WAREHOUSE COMPANY, Cross-defendant and Respondent.

Lillick, Geary, McHose & Roethke, Lillick, McHose, Wheat, Adams & Charles and Lawrence D. Bradley, Jr., for Defendant and Appellant and for Defendant, Cross-complainant and Appellant.

Magana, Olney, Levy & Cathcart, Mitchell Levy, Ellis J. Horvitz and Morton Minikes for Plaintiff and Respondent.

Sikes, Pinney & Matthew and John Scott Matthew for Cross-defendant and Respondent.

FOURT, J. — This action was instituted by longshoreman Arthur Flores (hereinafter called Flores) against ship's owner Thor-Dahl A/S (hereinafter called Thor-Dahl) for damages for personal injuries suffered when, in the course of his employment by Crescent Wharf & Warehouse Company (hereinafter called Crescent), Flores was engaged in unloading the vessel *Thorsisle*. Thor-Dahl filed a cross-complaint for indemnity against Crescent and the jury returned a verdict of $78,850 in favor of Flores but denied indemnity to Thor-Dahl; judgment was entered accordingly. ▮ Because the accident was sustained by a longshoreman aboard a seagoing vessel, this action is controlled by federal maritime law in both its substantive and its procedural aspects. (*Vittone* v. *American President Lines*, 228 Cal.App.2d 689, 693 [39 Cal. Rptr. 758] ; *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U.S. 625 [3 L.Ed.2d 550. 79 S.Ct. 406] ; *Pope & Talbot, Inc.* v. *Hawn*, 346 U.S. 406, 409 [98 L.Ed. 143, 74 S.Ct. 202].)

Appellant Thor-Dahl contends that the jury was improperly instructed concerning the nature and extent of Crescent's duty as a stevedore company under contract to unload *Thorsisle* with respect to its implied warranty of workmanlike service. It is Thor-Dahl's further contention that this instruction adversely influenced the jury in its deliberations on the issue of damages as evidenced by the fact that it failed to reduce the award to accommodate for the contributory negligence of Flores. The pivotal issue herein is the extent of the responsibility owed by the stevedore company and its employee to discover and remedy latent defects in the ship's equipment, unknown to the vessel's crew or the stevedore company beforehand.

The vessel *Thorsisle* was a Norwegian ship owned and operated by Thor-Dahl and engaged in carrying cargo and passengers between ports on the west coast of the United States and islands in the South Pacific. Flores was 34 years old and had, at the time of the accident, about seven years' experience in all phases of work as a longshoreman. When he reported to the longshoremen's union hall for a work assignment on December 13, 1961, he was dispatched to the employ of Crescent to assist as a winch-driver in unloading the *Thorsisle*. According to custom, he reported to the hatch boss at the vessel, and was assigned to one of the winches to perform familiar duties.

His first task in preparation for the unloading operation was to lower the yard boom from the upright position in which the ship's crew had previously placed it.

The boom is fitted with a topping lift cable which raises the boom from the cradle in which it rests while the vessel is at sea and holds it in an elevated position in anticipation of its use in port. When the boom is so elevated, the topping lift cable is wrapped in a few circles and then in figure eights around cleats on the deck floor to keep the cable taut. In order to lower the boom by means of the winch the topping lift cable must be transferred from the cleats to the gypsy head of the winch. Since there is always a strain on the topping lift cable whenever the boom is out of its cradle, a stopper is provided at each boom to hold the topping lift cable temporarily in place while the cable is transferred from the gypsy head to the cleats or vice versa. These stoppers may be clamp-type, as were those on the *Thorsisle,* with the two halves hinged at one end, a wing or butterfly nut at the other end, and a rifled groove down the middle of each clamp face so that when the topping lift cable is in place it fits snugly into the groove.

Topping lift cables are comparatively heavy, stiff cables with a natural tendency to spring off the cleats so the man handling the cable must, as a precaution, hold the cable taut throughout the transfer from cleats to gypsy head. Moreover, there is always the possibility that the topping lift cable will not be held firmly by the rifling in the groove of the stopper and the man who lowers the boom must test the stopper. There is no test or inspection that can be made beforehand to determine that the stopper will hold the cable once it is undone from the cleats. Instead, the stopper is tested in use by placing the cable in the stopper, then tightening the stopper by turning the butterfly lever, thereafter removing the figure eights from the cleats, and finally loosening or "surging" the cable slightly into the stopper to see if it holds. If the stopper holds properly, the topping lift cable is taken off the cleats and transferred to the gypsy head and the boom is lowered by means of the winch. In the event the stopper fails to hold, the longshoreman must pull hard on the cable and attempt to return the figure eights to the cleats. The longshoreman who performs this operation must work alone up to the point where the cable has been transferred to the winch.

In the instant case, Flores testified that he tightened the

stopper by turning the butterfly lever as hard as he could until the faces of the stopper appeared to be pressing tightly against the cable and then proceeded to remove the small line which is tied about the cleats above the figure eights to secure the cable. He thereafter removed the figure eights of cable from the cleats and surged the cable to make sure the stopper would hold, but the stopper did not hold and the cable started to run rapidly through the stopper. Flores tried to stop the running cable by pulling back hard, but because of the limited work area he could not gain the necessary leverage and, as he could not prevent his hands from being drawn to the cleats, he let go of the cable which started to snake in and out and finally hit him, throwing him to the deck of the ship. He testified that he had time in the instant before he fell to notice that the butterfly lever on the stopper was spinning backwards.

Some five or ten minutes after the accident one of Flores' fellow longshoremen aboard the *Thorsisle* examined the stopper clamp and observed that the inside face of the clamps had a build-up of paint drippings about a quarter of an inch thick and a substantial accumulation of heavy grease and paint chips but when he looked later the same day these faces had been scraped free of the excess paint and grease. Subsequent testimony of this witness and the ship's then chief officer established that the accumulation of paint and grease on the inside face of the stopper clamps aboard a vessel is a recognized maritime hazard and one that the ship's crew customarily takes precaution to avoid because this prevents the stopper from holding well.

Flores suffered, as a result of the accident, a severe compound fracture of his leg which required emergency surgery in which a plate and four screws were inserted to hold his leg straight. The plate was later removed and a metal pin inserted across the fracture while, at the same time, grafts were made of bone from Flores' other hip to encourage new bone formation. Finally, after spending some 22 months in a hip-length cast, Flores was able to return to work in a limited capacity with some attendant pain and difficulty.

■ In maritime cases the rule of comparative negligence applies, and Thor-Dahl claims that a new trial should be granted because the jury did not reduce the amount of the award to reflect the alleged contributory negligence of Flores, thus rendering the verdict excessive as a matter of law. The jury was justified in concluding, however, from substantial

evidence at the trial, that Flores' negligence, if any, was not a contributing factor in the accident.

Flores testified that before he tested the stopper he inspected it visually without opening the clamps and observed nothing wrong with it. He further testified that the work area, which was only 18 inches wide, seemed small but, though he had frequently performed the stopper test before, he had never experienced a stopper failure and did not realize the significance of or report this space inadequacy. Since the evidence amply sustains the inference that the unseaworthy stopper condition caused the accident, and the ship owes to both seamen and longshoremen employed about the vessel an absolute duty to maintain for their use appropriate and seaworthy equipment (*Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872]), the jury was justified in its implied finding that even if Flores were in some way negligent, his conduct did not constitute a proximate cause of the accident. ▇ As appellant concedes, there is nothing specific in the record from which it can be determined whether or not the jury found Flores contributorily negligent, and appellant presumes merely that since provable damages were substantially lower than the verdict, the jury failed to apply the court's instruction to reduce them in proportion to Flores' negligence.

We perceive no sound basis for appellant's assumption that the jury defected in its responsibility to consider Flores' comparative negligence, if any, or to segregate as directed the instructions given by the court and apply only those appropriate in resolving the respective issues. We are not impressed with appellant's premise that the amount of the award, in and of itself, discloses a misapplication of law by the jury.

▇ We find herein, moreover, no miscarriage of justice with respect to the jury's verdict that Thor-Dahl is not entitled to indemnity. The United States Supreme Court, in a landmark decision (*Ryan etc. Co.* v. *Pan-Atlantic S.S. Corp.*, 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232]), imposed upon stevedoring companies generally an implied warranty of workmanlike service and the liability of Crescent must be determined in this contest. The jury was, nonetheless, justified in inferring from the evidence either that no breach thereof occurred or that, in any event, defective performance by Crescent did not proximately cause the accident.

Testimony disclosed that the custom and practice among

San Diego longshoremen at the time of the accident was to make a visual inspection of the ship's gear and proceed to use it if it appeared to be in good condition without first taking it apart or examining it for hidden or latent defects. This accords with Flores' testimony that he observed no gross defects in the stopper before its use. The law would impose an untoward burden on the stevedore company to require that its employees dismantle and inspect the ship's equipment for latent defects prior to use.

Appellant refers to rule 9.52(b)(3) of the Safety and Health Regulations for Longshoring (29 C.F.R., pt. 9 to subtitle A, effective March 21, 1960, and in force at the time of the accident) which provides that stopper clamps shall not be used unless they appear to be in good condition and free of paint and dirt which would prevent their being drawn tight, but we have been referred to no decision which has interpreted this regulation to impose on the stevedore company the duty to discover this condition by taking the clamps apart.

Appellant observes that the shipowner's breach of its duty to maintain a seaworthy vessel no longer constitutes an absolute bar to indemnity from the stevedore company. Decisions subsequent to *Ryan* ". . . have made clear that the stevedore's obligation to perform with reasonable safety extends not only to the stowage and handling of cargo but also to the use of equipment incidental thereto, *Weyerhaeuser S.S. Co.* v. *Nacirema Operating Co.*, 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438], including defective equipment supplied by the shipowner, *Crumady* v. *The J. H. Fisser, supra* (358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445]), cf. *Waterman S.S. Corp.* v. *Dugan & McNamara, Inc.*, 364 U.S. 421 [5 L.Ed.2d 169, 81 S.Ct. 200], and that the shipowner's negligence is not fatal to recovery against the stevedore." (*Italia Societa Per Azioni de Navigazione* v. *Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 319-320 [11 L.Ed.2d 732, 84 S.Ct. 748].)

The shipowner is entitled to relief where the stevedore company induces the accident by bringing into play the hazardous condition (*Crumady* v. *The Jochim Hendrick Fisser*, 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445] ; *Weyerhaeuser S.S. Co.* v. *Nacirema etc. Co.*, 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438] ; *Pettus* v. *Grace Line, Inc.*, 305 F.2d 151). The application of this principle is, however, limited to circumstances where the stevedore company knew and recognized the existence of the defective condition, and the use of un-

seaworthy equipment despite such knowledge constituted the fatal breach. (*Crumady* v. *The Jochim Hendrick Fisser, supra*; *Matson Terminals, Inc.* v. *Caldwell*, 354 F.2d 681.) We have been referred to no decision which extended protection to the shipowner when the latent defect was unknown to both the shipowner and the stevedore company. The evidence, moreover, does not command the inference that the stevedore company in the reasonable and workmanlike performance of its services should have discovered this dangerous latent condition prior to the operational test of the stopper. Appellant concedes that "there is no other conceivable way (except by taking apart the stopper) in which the stevedore company could . . . make certain the stopper was free of paint and dirt which would prevent it from being drawn tight," but urges that a breach of workmanlike service may be presumed from the mere fact that an accident resulted in the performance of the customary test. Even if we agreed, we would not be entitled to thus invade the province of the jury.

In this regard appellant complains of the following instruction, clearly limited in applicability to the case for indemnity against the stevedore company: "You have been instructed that the stevedore company owes a duty to the shipowner to conduct its operations, through the exercise of ordinary care, in a reasonably safe manner.

"However, the stevedore company does not have a duty to the ship to discover and remedy a hidden or latent defect of which it was not informed and which is not obvious upon cursory inspection." Appellant strongly objects to the adjective "cursory" as inadequate to describe the duty of inspection which the stevedore company bears under its contractual relationship with the shipowner. The selected language taken out of context may imply a superficial inspection generally inappropriate to circumstances so fraught with potential hazard as the unloading of a ship's heavy cargo but this does not compel the conclusion that any miscarriage of justice occurred in the trial. This terminology is, moreover, supported by at least two recent decisions of the United States Court of Appeals. "We hold that an implied warranty of workmanlike performance by a stevedore does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessel being loaded or unloaded which are not obvious upon a cursory inspection." (*Ignatyuk* v. *Tramp Chartering Corp.*, 250 F.2d 198, 201; relied upon in *Cia*

*Maritima Del Nervion* v. *James J. Flanagan Ship. Corp.*, 308 F.2d 120.)

The accident resulted from a hazardous and latent unseaworthy condition of the vessel, which it is the shipowner's responsibility to maintain. While the negligence of the shipowner may not bar its recovery from the stevedore company (*Italia Societa per Azioni de Navigazione* v. *Oregon Stevedoring Co., supra,* 376 U.S. 315) still the stevedore company should not be charged on its warranty by reason of failure to make a cautious inspection of the ship's gear (*Cia Maritima Del Nervion* v. *James J. Flanagan Ship. Corp., supra,* 308 F.2d 120). It is only those defects which have been in fact observed by the stevedore company for which it may be responsible if it uses the equipment thereafter without ascertaining that the condition has been remedied. (*T. Smith & Son, Inc.* v. *Skids A/S Hassel,* 362 F.2d 745.)

We are compelled to conclude that the language of the court in *Ignatyuk* v. *Tramp Chartering Corp., supra,* describes the duty of the stevedore company with sufficient accuracy from a practical perspective. This is true for the significant reason that any inspection which would impose upon the stevedore the duty to dismantle the ship's gear would be impractical and prohibitive in cost to the shipowner itself.

" 'Certainly the shipowner would not only object but would prohibit the dismantling of every piece of ship's gear, such as winches, lights, etc. in a professed effort by the stevedoring company to ascertain whether or not the ship's own appurtenances were seaworthy.' *Ray* v. *Compania Naviera Continental, S.A.* (D.Md. 1962) 203 F.Supp. 206, 211." (*Cia Maritima Del Nervion* v. *James J. Flanagan Ship. Corp., supra,* p. 125.)

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied March 23, 1967, and appellants' petition for a hearing by the Supreme Court was denied April 26, 1967.