MATSON TERMINALS, INC., a corporation, Appellant,

v.

William E. CALDWELL, and Sea-Land Service, Inc., etc., Appellees.

No. 20026.

United States Court of Appeals
Ninth Circuit.

Dec. 29, 1965.

Petition for Rehearing Denied
Feb. 4, 1966.

Jean Wunderlich, Spray, Gould & Bowers, Los Angeles, Cal., for appellant.

Leo J. Vander Lans, Thomas A. Vyse, Graham, James & Rolph, Long Beach, Cal., for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

This is an action by a ship owner, Sea-Land Service, Inc., (Sea-Land), against the contracting stevedore company, Matson Terminals, Inc., (Matson), to recover indemnity for breach of a stevedore's implied warranty of workmanlike service.

Under a written contract, Matson agreed to act as stevedore and terminal operator and " * * *, as directed, with all possible dispatch, load and/or discharge all cargoes of vessels owned, operated or controlled by" Sea-Land, "and will perform terminal services upon such vessels" at Matson operated piers. Sea-Land granted to Matson the exclusive right of handling all such cargoes at the rates of charges fixed in the schedule.

Matson agreed "while doing the utmost to carry out all the work hereby undertaken to be done", it was not to be responsible for delays or losses caused by strikes, labor troubles, Acts of God, etc. All work to be performed by Matson was to be in accordance with working rules as set forth in agreements between the longshoremen and the Pacific Maritime Association. In the absence of such agreements, current practice of the port prevailed. Matson agreed to be responsible "for all losses and damage to the vessel, its equipment or cargo, caused through or as the result of its own negligence or malpractice." In the event of such loss or damage such fact is to be called to the attention of Matson and acknowledgment thereof obtained. In a like manner, Matson is to call to the attention of Sea-Land "unsatisfactory conditions which may exist for which the owner is responsible and obtain acknowledgment thereof."

Sea-Land agreed "to supply booms, adequate winches in good working order

and with sufficient steam or power for their efficient operation; blocks, topping lifts, guys and wire falls of sufficient length and strength, lights on vessel for work at night, and derricks or cranes for such heavy lifting as exceeds the capacity of ship's gear."

Following the unloading operations and while a pontoon was being put back in place, various longshoremen, including one Caldwell, employed by Matson and acting within the course and scope of their employment, helped in guiding the pontoon into place either by pushing or pulling on the guy lines after the pontoon was lifted by a winch operated by a longshoreman, likewise an employee of Matson and acting within the course and scope of his employment. Caldwell was injured when the pontoon "jumped" and struck him on the hand.

Caldwell brought suit against Sea-Land alleging negligence and unseaworthiness on the part of Sea-Land. Sea-Land included Matson in a third party indemnity action, alleging *inter alia*, breach of implied warranty of expertise owing Sea-Land by Matson.

Following trial to the court sitting without a jury, the district court found that the pontoon struck Caldwell as the result of a defective condition in the winch mechanism, and concluded the vessel was unseaworthy by reason thereof. The district court found that Matson breached its contract, express and implied, with Sea-Land.

Judgment was rendered in favor of Caldwell against Sea-Land and in favor of Sea-Land against Matson in the amount of $14,785.81, consisting of $12,-556.09, personal injury award, $39.52 costs, and $2,190.20 attorney's fees. The judgment in favor of Caldwell was paid by Sea-Land. Caldwell is not concerned in this appeal.

No question is raised as to the jurisdiction of the district court or of this court.

There appears to be little, if any, dispute between the parties as to the facts of the case. They may be summarized as follows:

About April 10, 1962, Sea-Land's vessel, S.S. SHORT HILLS, docked in the Los Angeles harbor at a Matson operated pier. The gear was rigged by longshoremen and uncovering operations were commenced. The first winch operator was Frank C. Salcido, who alternated as a winch operator and hatch tender with Robert Rheinhardt, a winch operator and hatch tender of long experience who was also the safety man of the longshoremen. Almost immediately on checking out the gears and winches, before or at the time when uncovering operations were commenced, Mr. Salcido discovered that the winch was not operating properly. He reported such fact to Mr. Rheinhardt. Mr. Rheinhardt immediately took over the operation of the winch. His first task was to remove a series (6) of heavy metal pontoons which were covering the ship's hatch. Each pontoon weighed one and one-half to two tons. As he began the removal of the first pontoon, he also experienced difficulty with the winch which would not hoist on one gear—there was a slippage. Rheinhardt thereupon notified his hatch foreman, who told the ship's mate, who told the ship's electrician. The work of removing the pontoons, however, continued although with difficulty. Certain compensating movements were required. Rheinhardt was aware at that time that Safety and Health Regulations for Longshoring (June 1960) issued by the United States Department of Labor, provided at Section 9.53(c) (2) that winches shall not be used when one or more control points, either hoisting or lowering, is not operating properly. The ship's electrician arrived when there were one or two pontoons remaining to be removed. He observed Rheinhardt operating the winch. The electrician went away stating "I'll see what I can do about it." The remaining pontoons were removed with the same difficulty. The electrician returned and inquired "How are they working now?" At that time all of the pontoons had been removed and the winch was

handling empty cardboards, pallet boards and light cargo, at which time the winch appeared to operate properly. Rheinhardt never asked the electrician if repairs had been effected, never saw him do anything to remedy the defect, and was never advised that anything had been done.

Between the uncovering and the covering operations Rheinhardt had no trouble with the winches. Covering operations started on April 12, 1962 and Caldwell was injured during the course of replacing the first pontoon, and just prior to the time the pontoon was almost seated, at which time Rheinhardt noticed slippage. As to this circumstance Rheinhardt, in substance, testified: that when the pontoon was within inches of where it was to be placed, he discovered the winches weren't in proper working order —there was a slipping—at which time he attempted to compensate for the slipping by putting the winch into a higher control point, at which time he could have stopped the operation but which he did not do because the pontoon was almost where they were trying to place it.

Rheinhardt testified that it was the custom and practice in the industry for the ship's crew to maintain and repair the ship's gear, and that after a report is made to the shipowner of a malfunction of the ship's gear, "the job will be shut down completely by pulling or disconnecting the power which will make it completely impossible to use the equipment, or else, 'or they will tell you to go ahead and work it [the equipment] and they will fix it.'"

The findings of fact of the district court include the following:

## "VI

"That on April 12, 1962, CALDWELL was guiding a pontoon into position at hatch No. 1; that while so engaged, the pontoon swung from the coaming of No. 1 hatch and struck him on the right hand causing severe injuries.

## "VII

"That the pontoon struck CALDWELL as the result of a defective condition in the winch mechanism serving hatch No. 1.

## "VIII

"That the written contract between SEA-LAND SERVICE, INC., and MATSON TERMINALS, INC., provided that MATSON would call to the attention of SEA-LAND unsatisfactory conditions which may exist for which SEA-LAND is responsible and obtain acknowledgment thereof; that there was an implied warranty that MATSON would render safe and workmanlike stevedoring services to SEA-LAND.

## "IX

"That prior to CALDWELL'S injury, the winch driver of hatch No. 1, employed by MATSON TERMINALS, INC., noted that the winch mechanism serving No. 1 hatch was defective; that the winch driver continued to operate the winch; that he brought the defect to the attention of the vessel's electrician and that the electrician disappeared toward the direction of the vessel's fusebox; that the winch driver failed to ascertain whether repairs had been effected by vessel personnel, and failed to obtain acknowledgment that repairs would be effected or had been effected, before continuing to operate the winch; and that by permitting its winch driver to continue to operate a known defective winch and by its winch driver failing to ascertain whether repairs had been effected or obtain acknowledgment that repairs had been effected or would be effected, MATSON TERMINALS, INC., breached its contract, express and implied, with SEA-LAND SERVICE, INC.

## "X

"That as between SEA-LAND SERVICE, INC., and MATSON

TERMINALS, INC., the latter was in a superior position to prevent the injury to CALDWELL."

Among its conclusions of law are the following:

"III

"That the SS SHORT HILLS was unseaworthy by reason of the defective winch mechanism serving No. 1 hatch.

"IV

"That MATSON TERMINALS, INC. breached its contract, express and implied, with SEA-LAND SERVICE, INC. in that its winch driver failed to cease operating the winch once the defect was noted and failed to ascertain that repairs had been effected before continuing to operate the winch.

"V

"That as a proximate result of such breach of contract, vessel unseaworthiness was brought into play and WILLIAM E. CALDWELL was injured."

Neither party questions on this appeal the propriety of the allowance by the district court of the judgment in favor of the injured longshoreman and against Sea-Land. Matson concedes that its stevedoring contract with Sea-Land includes an implied warranty on the part of Matson to perform such services in a workmanlike manner. In this respect Matson states:

"Much is said in Pettus [1] about the problem whether an express clause pertaining to the liability of the stevedore negates an implied in fact warranty of workmanlike service. This problem does not arise in the case at bar because it has never been contended by appellant that an implied warranty does not exist. Appellant claims that it fulfilled its implied warranty in view of the fact that the shipowner who had the positive contractual duty to repair the winches gave every appearance that he had done so and that the winches, in fact, worked properly thereafter for a number of days.

" * * *. We do not contend that an express warranty by the stevedore excludes the existence of implied warranties of workmanlike service." (Appellant's reply brief, p. 7.)

This posture of the appeal requires us to examine the characteristics and nature of an implied warranty of workmanlike service. One of the latest expressions of the Supreme Court on this subject appears in Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed. 2d 732 (1964). In the course of its opinion the Supreme Court stated at pp. 318–324, 84 S.Ct. at pp. 750–754:

"In Ryan [Stevedoring Co.] v. Pan-Atlantic [S.S.] Corp., 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133], the landmark decision in this area, it was established that a stevedoring contractor who enters into a service agreement with a shipowner is liable to indemnify the owner for damages sustained as a result of the stevedore's improper stowage of cargo. Although the agreement between the shipowner and stevedore was silent on the subject of warranties and standards of performance, the Court found that the essence of the stevedore's contract is to perform 'properly and safely.' 'Competency and safety * * * are inescapable elements of the service undertaken.' This undertaking is the stevedore's 'warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product,' 350 U.S., at 133–134 [76 S.Ct., at 237], a warranty generally deemed to cover defects not attributable to a manufacturer's negligence. See also Crumady v. The J. H. Fisser, 358 U.S. 423, 428–429 [79 S.Ct. 445, 448–449, 3 L.Ed.2d 413].

1. Pettus v. Grace Line, Inc., 305 F.2d 151 (2d Cir. 1962).

"The Court further distinguished in Ryan between contract and tort actions, stating that the shipowner's suit for indemnification 'was not changed 'from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service,' 350 U.S., at 134 [76 S.Ct., at 237, 100 L.Ed. 133], and pointedly declined to characterize the stevedore's conduct as negligent, notwithstanding that discussion in the opinion below centered on concepts of active and passive negligence on the part of the shipowner and stevedore. Although in Ryan the stevedore was negligent, he was not found liable for negligence as such but because he failed to perform safely, a basis for liability including negligent and nonnegligent conduct alike.

"Subsequent decisions have made clear that the stevedore's obligation to perform with reasonable safety extends not only to the stowage and handling of cargo but also to the use of equipment incidental thereto, Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563 [78 S.Ct. 438, 2 L.Ed. 491], including defective equipment supplied by the shipowner, Crumady v. The J. H. Fisser, supra; cf. Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421 [81 S.Ct. 200, 5 L.Ed. 2d 169], and that the shipowner's negligence is not fatal to recovery against the stevedore. '[I]n the area of contractual indemnity an application of the theories of "active" or "passive" as well as "primary" or "secondary" negligence is inappropriate.' Weyerhaeuser, supra, at 569 [78 S.Ct. at 442, 2 L.Ed.2d 491]. And last Term in Reed v. The Yaka, 373 U.S. 410 [83 S.Ct. 1349, 10 L.Ed. 2d 448], we assumed, without deciding, that a shipowner could recover over from a stevedore for breach of warranty even though the injury-causing defect was latent and the stevedore without fault. We think that the stevedore's implied warranty of workmanlike performance applied in these cases is sufficiently broad to include the respondent's failure to furnish safe equipment pursuant to its contract with the shipowner, notwithstanding that the stevedore would not be liable in tort for its conduct." [Footnotes omitted].

Under the stevedoring contract, Sea-Land agreed to supply adequate winches in good working order. It failed to do so. However, Matson discovered that the winches were not in good working order immediately upon commencement of its stevedoring operations and several days prior to the occurrence which caused injury to Caldwell. At the time that Matson discovered and became aware of the malfunctioning of the winches, it can hardly be asserted that Sea-Land's failure to supply winches in good working order constituted such a material breach of the stevedoring contract, or of such conduct on the part of Sea-Land, as to preclude it from enforcing the contract to recover indemnity arising out of an occurrence which occurred several days later under circumstances which did not exist when Matson discovered the unsatisfactory condition of the winches. Upon discovery of the unsatisfactory condition Matson was obligated to call such condition to the attention of Sea-Land and obtain acknowledgment thereof. Conceivably, the unsatisfactory condition of the winches would have justified Matson in discontinuing its stevedoring operations, which were hazardous, until Sea-Land had remedied the defect. DeGioia v. United States Lines Company, 304 F. 2d 421, 424 (2d Cir. 1962); Simpson v. Royal Rotterdam Lloyd, 225 F.Supp. 947, 952 (S.D.N.Y.1964).

Matson called Sea-Land's attention to the unsatisfactory condition but did not stop work and continued, with difficulty because of the unsatisfactory condition, to remove all the pontoons as well as lighter cargo which was removed without difficulty.

The injury to Caldwell occurred after unloading operations had been completed while Matson was attempting to replace the first pontoon. Circumstances had occurred between the time of the discovery by Matson of the unsatisfactory condition of the winches, and the time of the injury to Caldwell, which must be considered. Admittedly Matson received no acknowledgment from Sea-Land that the unsatisfactory condition of the winches had been called to the attention of Sea-Land. Rheinhardt never inquired of the ship's mate or electrician, or other member of the ship's crew, if the unsatisfactory condition had been remedied, never saw any repairs being made, and was never advised that anything had been done to remedy the malfunction. He simply assumed from his conversations with the electrician, and from the removal of lighter cargo from the vessel without difficulty, that the unsatisfactory condition had been remedied. Nothing in the record suggests that Rheinhardt made any tests to see if the malfunction had been remedied.

The district court found as facts [Finding IX, supra]

"[T]hat the winch driver failed to ascertain whether repairs had been effected by vessel personnel, and failed to obtain acknowledgment that repairs would be effected or had been effected, before continuing to operate the winch; and that by permitting its winch driver to continue to operate a known defective winch and by its winch driving failing to ascertain whether repairs had been effected or obtain acknowledgment that repairs had been effected or would be effected, MATSON TERMINALS, INC. breached its contract, express and implied, with SEA-LAND SERVICE, INC."

Matson contends that such findings are not supported by the evidence. We disagree. From our study of the record we are unable to say that such findings are wholly erroneous.

■■ It is to be noted that competence and safety are the essence of the implied obligation of the stevedore to render workmanlike service. Matson was in charge of the stevedoring operations. It is a specialist in that field. Having early secured knowledge of the defective winches, and having continued to use them until Caldwell was injured, with no satisfactory evidence that the unsatisfactory condition had been remedied, falls short of that standard of expertise embodied in its implied obligation to furnish workmanlike service. In our view, in light of the circumstances of this case, the conduct of Sea-Land did not constitute such material breach of its contract so as to preclude it from enforcing the contract of indemnity. Pettus v. Grace Line, Inc., supra.

We have carefully considered Hagans v. Farrell Lines, 237 F.2d 477 (3d Cir. 1956), and Hodgson v. Lloyd Brasileiro Patrimonio Nacional, etc., 294 F.2d 32 (3d Cir. 1961), heavily relied upon by Matson but are not persuaded.

We find no error either in the fact or amount of the allowance by the district court of attorney's fees to Sea-Land.

The judgment appealed from is affirmed.