Ernest O. DEFFES, Appellant,

v.

FEDERAL BARGE LINES, INC. and
Gulf-Canal Lines, Inc., et al.,
Appellees.

No. 21868.

United States Court of Appeals
Fifth Circuit.

May 26, 1966.

Rehearing Denied July 6, 1966.

Jones, Circuit Judge, dissented.

Edgar N. Quillin, Arabi, La., Sherman F. Raphael, New Orleans, La., for appellant.

Edmond C. Salassi, Thomas J. Wyllie, New Orleans, La., for appellees.

Before JONES and THORNBERRY, Circuit Judges, and SLOAN, District Judge.

THORNBERRY, Circuit Judge:

The plaintiff, a stevedore employed by Continental Grain Company (Continental), was injured while unloading grain from Barge FBL 625 which is owned by Federal Barge Lines, Inc. (Federal) and chartered by Gulf-Canal Lines, Inc. (Gulf). Plaintiff sued Federal and Gulf for damages, and the defendants filed a third-party complaint against Continental as the employer of the plaintiff. The district court held for the defendants. 229 F.Supp. 719.

The injury resulted from an alleged defect in a marine leg, a mechanical elevator device, owned by Continental. The marine leg is basically a conveyor belt to which buckets are attached. It is permanently attached to the dock at all times and is designed for use in unloading grain from barges. The power for raising, lowering and operating the leg is supplied by shore-based facilities, and all the equipment used is owned by Continental.

The unloading operation is performed in four stages: (1) The marine leg is introduced through the open hatch of the barge into the grain, and grain is, in effect, "dug" out by the buckets on the conveyor belt. During this stage, there is no contact with the barge. (2) Large scoops, generally called "air buckets," operated by means of pulleys and cables, are utilized to bring the grain from the ends of the barge to the marine leg. The pulleys are attached to the barge at various places by means of hooks and are connected with the marine leg by cables. All this equipment is stored in the marine leg when not in use. (3) When the grain level has been lowered sufficiently, the air buckets are detached and stored and small bulldozers serving essentially the same purpose as the air buckets are brought into use. (4) The last phase of the process is the "sweeping up," during which stevedores sweep up the grain and shovel it into the marine

leg. At this stage, the marine leg rests on the bottom of the barge. The injury occurred during this last phase of the unloading.

Plaintiff claimed that a piece of metal from a worn bucket broke off and hit him in the eye. He received compensation from his employer, Continental, under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. Plaintiff sought recovery against Federal and Gulf on the theory that the allegedly defective marine leg and the failure of Continental to supply goggles in compliance with the Safety and Health Regulations for Longshoring, 29 C.F.R. § 9.1, rendered the barge unseaworthy.

The district court noted that

"[a]n owner of a vessel may be liable for an unseaworthy condition which has been caused by an independent contractor and [that] the doctrine has been extended to include equipment brought aboard and used and controlled exclusively by stevedores in loading and unloading a vessel. Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954)."

Deffes v. Federal Barge Lines, Inc., E.D. La.1964, 229 F.Supp. 719, 721.

The court, citing McKnight v. N. M. Paterson & Sons, 6th Cir. 1960, 286 F.2d 250, cert. denied, 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed.2d 130, and Sherbin v. S. G. Embiricos, Ltd., E.D.La.1962, 200 F. Supp. 874, found that the Petterson and Rogers cases involved equipment which was "traditionally a part of a ship's appurtenant appliances and equipment." Ibid. Since the marine leg was not "equipment traditionally found aboard and used in unloading operations," the court held that a defect in the marine leg would not cause the barge to be unseaworthy.

The court also concluded that a "[v]iolation of a safety regulation applicable to a stevedore does not render a vessel unseaworthy unless the violation creates a dangerous condition aboard the vessel, which would constitute a defect in the vessel's hull, gear, stowage and appurtenant appliances and equipment," and that the barge owner had discharged his duty of reasonable care by hiring a reputable firm to handle the loading and unloading of the barge. Id., 721–722.

The basic question presented on this appeal is whether a defect in a shore-based marine leg can cause a barge to be held unseaworthy. Similar questions have been considered by several courts and have resulted in a sharp conflict between the circuits. The opinion of the district court relies on the Sixth Circuit decision in the McKnight case and is also supported by the Second Circuit's opinion in Forkin v. Furness Withy & Co., 2d Cir. 1963, 323 F.2d 638. The opposite view has been espoused by the Ninth Circuit in Huff v. Matson Navigation Co., 9th Cir. 1964, 338 F.2d 205, cert. denied, 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed.2d 963 and by the Third Circuit in Spann v. Lauritzen, 3rd Cir. 1965, 344 F.2d 204, cert. denied, 382 U.S. 1000, 15 L.Ed.2d 489. After carefully considering these cases and the Supreme Court cases which have developed the doctrine of unseaworthiness, we conclude that the decisions of the Ninth and Third Circuits correctly state the law and that, therefore, the holding of the district court must be reversed.

The doctrine of unseaworthiness was conceived by the Supreme Court in The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, as a device for imposing liability on ship owners for injuries to seamen. Since that time there has been a steady expansion of the scope and coverage of the doctrine. Thus, in Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 89, 66 S.Ct. 872, 875, 90 L.Ed. 1099, the Supreme Court considered the question "whether the shipowner's obligation of seaworthiness extends to longshoremen injured while doing the ship's work aboard but employed by an independent stevedoring contractor whom the owner has hired to load or unload the ship."

The Court discussed at length the rationale of the doctrine and noted that

"the hazards of marine service which unseaworthiness places on the men who perform it. * * *, together with their helplessness to ward off such perils and the harshness of forcing them to shoulder alone the resulting personal disability and loss, have been thought to justify and to require putting their burden, in so far as it is measurable in money, upon the owner *regardless of his fault.* * * * [T]he owner * * * is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its cost.

\*     \*     \*     \*     \*     \*

"[T]his policy is not confined to seamen who perform the ship's service under immediate hire to the owner, but extends to those who render it with his consent or by his arrangement. All the considerations which gave birth to the liability and have shaped its absolute character dictate that *the owner should not be free to nullify it by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing its service of their historic protection. The risks themselves arise from and are incident in fact to the service.* * * * [The owner's] ability to distribute the loss over the industry is not lessened by the fact that the men who do the work are employed and furnished by another. *Historically the work of loading and unloading is the work of the ship's service,* performed until recent times by members of the crew. * * * That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection.

\*     \*     \*     \*     \*     \*

"It seems, therefore, that when a man is performing a function essential to maritime service on board a ship the

fortuitous circumstances of his employment by the shipowner or a stevedoring contractor should not determine the measure of his rights."

Id. at 93–97, 66 S.Ct. at 877–879. (Emphasis added.)

The Court also found that the stevedore's remedy for unseaworthiness against the shipowner was in addition to his statutory remedy against his own employer. Id. at 100–102, 66 S.Ct. at 872.

The coverage of stevedores under the doctrine of unseaworthiness was further developed in Alaska Steamship Co. v. Petterson and Rogers v. United States Lines, supra. The stevedore's injury in *Petterson* was caused by a defective block which the Court assumed had been brought on board the ship by the stevedoring company. The Ninth Circuit found the vessel to be unseaworthy, Petterson v. Alaska Steamship Co., Inc., 9th Cir. 1953, 205 F.2d 478, and the Supreme Court affirmed per curiam, citing Seas Shipping Co. v. Sieracki, supra, and Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. In *Pope*, the Supreme Court has reaffirmed *Sieracki* and stated that *"Sieracki's* legal protection was not based on the name 'stevedore' but on the *type of work* he did and its relationship to the ship and to the historic doctrine of seaworthiness." Id. at 413, 74 S.Ct. at 207. (Emphasis added.) The injured man in *Pope* was a carpenter who was repairing the loading apparatus and was hurt when he fell through an uncovered hatch hole.

The Third Circuit in *Rogers* was concerned with an allegedly defective land fall runner, a device used in unloading cargo. In its discussion, the Court stated:

"Admittedly then, the alleged unseaworthy condition was not created by the ship. The runner was owned, produced and fastened to the winch by Lavino [the stevedoring company], which was in charge of and performing the unloading operation. And there is no indication that the ship sanctioned its use or even knew of its

existence. *The statement that the vessel adopted the runner as an appurtenance is simply not justified by the record.* * * * Since the wire alone or the manner in which it was handled, or both, caused plaintiff's hurts and since under the facts the presence of that wire cannot be construed as appellee's responsibility this judgment [for the defendant] should not, for the reason urged, be disturbed."

Rogers v. United States Lines, 3rd Cir. 1953, 205 F.2d 57, 57–58. (Emphasis added.) The Supreme Court reversed per curiam. 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120. Three justices dissented in both the *Petterson* and *Rogers* cases on the theory that the doctrine of seaworthiness as stated in *Sieracki* should not be extended to cover "the unseaworthiness of equipment owned and brought on board by a stevedoring contractor * * *" since the stevedoring company would be better able to eliminate the hazard. 347 U.S. at 401–402, 74 S.Ct. at 604.

The seaworthiness doctrine was further extended by the Supreme Court in Gutierrez v. Waterman Steamship Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L. Ed.2d 297. In that case, a longshoreman had slipped on beans spilled on the dock from defective bags during the unloading of cargo. The Court reiterated *Sieracki's* position that the "Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading," id. at 213, 83 S.Ct. at 1190, and found that the doctrine of seaworthiness applies to "longshoremen unloading the ship whether they are standing aboard ship or on the pier." Id. at 215, 83 S.Ct. at 1191.

Since the district court's opinion relies primarily on the decision in the *McKnight* case, we must first look to that case. McKnight, a longshoreman, was injured by unloading gear which was being lowered into the ship's hold by a shore-based crane. While the Sixth Circuit and the district court conceded that the plaintiff "might have been doing the

traditional work of a seaman," (i. e., unloading cargo), both courts concluded that "he was not incurring the hazards of a seaman, in that none of the traditional unloading gear of the ship, namely winches, masts, or booms, was being used * * *." 286 F.2d at 251, 181 F.Supp. at 440. The courts distinguished the Supreme Court decisions in *Sieracki, Rogers* and *Petterson* on this basis but cited no case to support this distinction.

Our reading of the Supreme Court cases leads us to a contrary conclusion. Loading and unloading is clearly held to be "work of the ship's service." Sieracki, supra; Crumady v. The Joachin Hendrik Fisser, 1959, 358 U.S. 423, 427, 79 S.Ct. 445, 3 L.Ed.2d 413; Italia Societa v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 323, 84 S.Ct. 748, 11 L.Ed.2d 732. Pope & Talbot v. Hawn, supra, instructs us to look to the *type of work* performed to determine the extent of liability under the doctrine of seaworthiness. Here we have a claimant who was admittedly injured while unloading a cargo of grain. Therefore, there can be no doubt that he is within the scope of the doctrine.

The district court below and the *McKnight* case would exclude the plaintiff here from recovery because, although he was doing seamen's work, he was not incurring a seaman's hazard since he was not using gear traditionally found aboard ship. The Supreme Court in *Sieracki*, however, attempts to negate this type of limitation on the concept of seaworthiness. As stated there, the shipowner "is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities." 328 U.S. at 100, 66 S.Ct. at 880. *McKnight* and the district court would permit the shipowner to escape liability merely by substituting a more modern method for performing the traditional work of a seaman. We can find no support in the Supreme Court cases for adopting such

a position. Nor can we find a rational basis for drawing this distinction. If one is performing seamen's work, by definition he must be subjecting himself to a seaman's hazard, no matter what type of equipment he is using to do the work. "The risks themselves arise from and are incident in fact to the service * * *." *Sieracki*, id. at 95, 66 S.Ct. at 877. If a seaman were injured in the engine room of a nuclear-powered vessel by some defect in the reactor, he could not recover under the rationale of *McKnight* and the district court, even though he was performing traditional seamen's work, because the shipowner had installed apparatus which had not traditionally been found on board ships. Such a result would be completely out of harmony with the Supreme Court's conception of the doctrine of seaworthiness.

The district court in *McKnight* found an additional basis for denying relief not used by the district court in the instant case. It concluded that the shore-based crane was not part of the hull, gear or stowage of the vessel, and, therefore, a defect in the crane or a fault in its operation could not make the ship unseaworthy. Again, the court cited no authority to support its conclusion. This reasoning also flies in the face of Supreme Court opinions. The Third Circuit attempted to draw the same distinction in the *Rogers* case. 205 F.2d at 57. The Supreme Court reversed per curiam. In the *Petterson* case, the Ninth Circuit assumed that the defective block belonged to the stevedoring company and that it had been brought on board by the stevedores. 205 F.2d at 479. The Supreme Court affirmed per curiam. The case at hand cannot be distinguished from the *Rogers* and *Petterson* cases on a rational basis. All three cases involved stevedore company equipment brought on board to assist in loading or unloading cargo. The mere fact that the marine leg is larger than a block *(Petterson)* or a land fall runner *(Rogers)* should not cause a different application of the law.

The courts in *McKnight* and *Forkin* attempted to draw further distinctions. They suggested that liability should not be imposed unless the injuring device is attached to or touching the ship. *McKnight*, 181 F.Supp. at 439 and n. 9; *Forkin*, 323 F.2d at 641. This limitation finds no support in the Supreme Court cases. As stated by the Ninth Circuit in *Huff*, this approach is "manifestly wrong and contrary to the controlling decisions * * *." 338 F.2d at 215. Even though it is admitted here that the marine leg at one stage in the process is attached to the barge and was at the time of the injury resting on the bottom of the barge, we join the Ninth Circuit in rejecting this purported exception to the doctrine of seaworthiness.

The opinions in *McKnight* and *Forkin* confuse the issue by introducing concepts of negligence into their consideration of the seaworthiness· question. They infer that the shipowner's power of inspection, 323 F.2d at 641, or his lack of control, 181 F.Supp. at 439, have relevance to the problem. This position, however, was clearly rejected by the Supreme Court when it stated in *Sieracki* that "liability is neither limited by conceptions of negligence nor contractual in character," 328 U.S. at 94, 66 S.Ct. at 877, and when it concluded in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, that "we can find no room for argument as to what the law is. What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence."

Several months after judgment was rendered below, the opinion of the Ninth Circuit in Huff v. Matson Navigation Co., 9th Cir., 1964, 338 F.2d 205, was handed down. Huff was also injured by the operation of a marine leg. The Ninth Circuit made a very thorough analysis of the Supreme Court cases and the decisions of the Sixth Circuit in *McKnight* and the Second Circuit in *Forkin*. It found the distinction drawn in *McKnight* that the longshoreman was not incurring a seaman's hazard because the gear was not that traditionally used in

unloading to be invalid. The Court concluded that the shipowner's absolute liability

> "for the results of defects in unloading equipment brought on board ship by the stevedoring company should not be qualified or modified if the unloading equipment thus used happens to be newly designed and devised and involves none of the traditional unloading gear of the ship. Use of more modern equipment can no more exculpate the shipowner from his obligations than could use of 'more modern divisions of labor.' [*Sieracki*] It would seem passing strange of the shipowner, whose obligation of seaworthiness, as stated in *Sieracki*, 'is peculiarly and exclusively the obligation of the owner * * *,' could in effect delegate and avoid his obligation by employing a stevedoring company which used newly invented unloading devices."

The Third Circuit in Spann v. Lauritzen, 3rd Cir. 1965, 344 F.2d 204, followed *Huff* and extended its holding considerably. The defective equipment in that case was a hopper located *on the pier*. A shore-based crane would scoop buckets of nitrate from the hold of a ship and empty them into the hopper. Trucks would drive under the hopper and a lever would release the contents of the hopper into the truck bed. The plaintiff was injured when a defective release mechanism caused the lever to descend prematurely and strike him. The Court agreed with the conclusion of the "Ninth Circuit in the *Huff* case that *McKnight* and *Forkin* are out of harmony with the principles announced by the Supreme Court" and allowed the plaintiff to recover. Id. at 209.

The analysis of *Huff* and *Spann* and the failure of the lower court and the courts in *McKnight* and *Forkin* to demonstrate a valid distinction as a basis for a limitation on the broad doctrine of seaworthiness as enunciated by the Supreme Court convinces us that a defective marine leg used in unloading grain makes a barge unseaworthy. Because of this conclusion, we find it unnecessary to consider the appellant's other contentions.

The judgment of the district court is reversed and the case is remanded for proceedings not inconsistent with this opinion.

Federal and Gulf, appellees, and Continental, third party defendant-appellee, have stipulated that in the event attorneys fees for the appeal of this case are awarded in favor of Federal and Gulf and against Continental, the amount should be set at $900. Since this case is being reversed and remanded, the District Court will have before it such stipulation for whatever action it deems appropriate.

JONES, Circuit Judge (dissenting).

In the opinion of the majority, it is shown that:

> "The injury resulted from an alleged defect in a marine leg, a mechanical elevator device, owned by Continental. * * * It is permanently attached to the dock * * *. The power for * * * operating the leg is supplied by shore-based facilities * * *. The injury occurred during this last phase of the unloading."

The end of the marine leg rested on the bottom of the barge. I do not see how it became a part of the barge merely by touching it.

I see no reason for this extension of the doctrine that a longshoreman is a seaman and equipment affixed to the shore is a part of a vessel. I would relegate the appellant to the remedy provided by the Longshoremen's and Harbor Workers' Compensation Act rather than impose a liability for negligence upon his employer by way of indemnity of the ship owner. Therefore, I dissent.

Rehearing denied; JONES, Circuit Judge, dissents.