Edward Cabon SIMMONS, Libelant,

v.

GULF AND SOUTH AMERICAN STEAM-
SHIP COMPANY, Inc., Respondent.

No. 5845.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 28, 1966.

Edgar N. Quillin, Arabi, La., John
Sidney Brown, Charles A. Arceneaux,
New Orleans, La., for libelant.

Terriberry, Rault, Carroll, Yancey & Farrell, Maurie D. Yager, William E. Wright, New Orleans, La., for respondent.

Lemle & Kelleher, Charles Kohlmeyer, Jr., Thomas W. Thorne, Jr., New Orleans, La., for respondent-impleaded and intervenor.

IN ADMIRALTY

AINSWORTH, Circuit Judge: *

This libel in personam was filed by Edward Cabon Simmons against Gulf and South American Steamship Company, Inc., for damages growing out of personal injuries sustained by Simmons on November 15, 1961. Simmons, a longshoreman employed by T. Smith and Son, Inc., was working aboard respondent's (Gulf) vessel, the GULF TRADER, docked in the Port of New Orleans.

The libel is based on alleged unseaworthiness of the vessel and failure to provide the longshoreman with a safe place to work. Respondent Gulf impleaded Smith, an independent contract stevedore, for indemnification (including attorney's fees, costs and expenses) on the basis of the *Ryan* Doctrine,[1] claiming that if Simmons was injured Smith had breached its implied warranty of workmanlike performance of a stevedore to a vessel. Smith has also cross-libeled as intervenor for medical expenses and compensation which it has already paid libelant under the Longshoremen's and Harbor Workers' Compensation Act.[2]

On November 15, 1961, Simmons and his fellow longshoremen, all employed by Smith, the stevedoring contractor, began their work on the night shift aboard the GULF TRADER at 6:00 p. m. The vessel had already called at several Gulf ports and was partially loaded. Libelant was working as lead-off man on the offshore gang in the No. 1 upper tween deck. The gang in this hatch consisted of eight longshoremen, four each constituting the inshore and offshore gangs. The No. 1 Hatch was already partially loaded with cargo stowed in the after end of the hatch and in the offshore wing. The longshoremen began loading in the area and somewhere between 8:30 and 9:30 p. m. the work ceased for an unspecified reason.[3] The longshoremen began playing cards in the lighted area awaiting resumption of work. The foreman was not present, being up on deck. Libelant, the lead-off man, did not play cards and began straightening out and restowing cargo in the offshore wing, including a number of small boxes which were scattered about. He came upon one large wooden box about 5 feet by 3½ feet which he found upended and resting partway on the lower batten of the vessel.[4] The box was tilted, about half of it resting on the batten and the balance on the deck of the ship. It was a high box reaching up to Simmons' chin, was in a damaged condition, and some of the wooden boards were split. Its weight was variously estimated at between 300 to 400 pounds up to 1,100 to 1,200 pounds. Simmons had found the box when he went into the hatch and decided it should be moved because it was leaning and in danger of falling and was an obvious hazard. Since the next work to be done was to be around the box, he believed that this cargo would be unsafe and that it was his place as lead-off man to straighten the box and move it off of the batten to the deck. He asked his nephew, Otis Simmons, a member of the inshore gang, to assist him in moving the box. His regular partner was playing cards at

---

* This case was tried before Judge Ainsworth as a district judge prior to taking office as circuit judge.

1. Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232 (1956).

2. At the time of trial Smith had expended $16,690 for compensation and $7,963.88 for medical expenses to Simmons.

3. Smith's records show that there was a work stoppage that night due to rain at 9:00 p. m. and the ship's log indicates rain at 9:10 p. m.

4. The lowest sweat batten was about 2 inches thick and about 16 inches above the deck, the next highest batten being 6 inches above.

the time and Otis was agreeable to helping him. Libelant held the box, using his longshoreman's hand hook to grasp it, and Otis Simmons, on the other side, placed his hook in the box and attempted to pull it away and twist it around so that it would sit up straight on the deck. In doing so, Otis' hook slipped and broke out of the damage, splintered box and Otis lost his hold which in turn threw the entire weight of the box which fell on libelant and caused injury to his lower back. Libelant continued to work but finally had to stop because he was in severe pain. On the following day his employer sent him to receive medical attention and he attempted to work after treatment but was unable to do so. His injury was then diagnosed as a herniated intervertebral disc and a lumbar laminectomy was performed on him on February 28, 1962.

There are numerous conflicts in the evidence and respondents, Gulf and Smith, vigorously assert that Simmons and his witnesses are unworthy of belief and that he was not and could not have been injured on the date or in the manner he described.[5] They point to numerous conflicts in his testimony at the trial compared with his discovery deposition taken more than two years before. Respondents also introduced evidence as to the actual cargo stowed on the vessel in the No. 1 Hatch of the upper tween deck to the effect that there was no box of this size or weight stowed in the area either before the vessel arrived at New Orleans for further loading or at any time during loading operations in New Orleans, and also to show that so much cargo had already been loaded at the time as to make it physically impossible for such a box to be situated in the area, there being no room for it. Respondents have analyzed every detail of the testimony given at the trial and on deposition to show inconsistencies and conflicts. They ask: Where did the large box come from which was resting on the batten? Who loaded it? Why was it not seen by Smith supervisory personnel or the vessel's crew? They ask why Simmons did not state on discovery that he had a witness to the accident (i. e., Cherryfield Butler, who testified at the trial). They point out that Simmons, in discovery testimony, said he reported the accident to his foreman, White, but at the trial said he reported the incident to the water boy, Mendoza. They show that Simmons failed to mention that the box was badly splintered when he testified on discovery as opposed to his trial testimony. At the trial Simmons testified that he was straightening out scattered boxes in the hatch, in the offshore wing, but no mention was made of this in his discovery deposition. Simmons was involved in an automobile accident six months before the present injury, and admitted this at the trial, but on pretrial deposition denied previous accident to his back.[6] Other discrepancies in testimony as to details are pointed out, all of which we have considered. At times Simmons was not the most lucid of witnesses, but consideration must be given for his lack of

---

5. Respondent Smith disputes the date on which the alleged accident occurred and introduced in evidence an Accident Report (Ex. 3) and Compensation file jacket (Ex. 6) indicating the time to be "11–14–61 5 A.M." The Accident Report contains many portions which are written over, others scratched out with a pen; in fact, the report was first filled out for another employee, one "O. Cornelius." Significantly it also states "worked until 10:00 P.M. 11–15–61," which is approximately the time and date Simmons states he was injured. The Compensation file was apparently made out as to time and date from the Accident Report as was the Em-

ployer's Report to the Deputy Commissioner. No explanation for the time and date on the Accident Report as 11–14–61 is furnished by Smith, and we consider the document unreliable as a contradiction of Simmons' testimony on this subject.

6. Simmons was less than candid here. He was in the hospital as a result of the automobile accident from April 29, 1961 to May 14, 1961, for treatment of severe contusion of the lumbar-sacral region. However, no bones were broken and he had an uneventful and apparently complete recovery as the complete medical record of that admission (which we have inspected fully) fully discloses.

education and for the fact that the trial occurred more than four years after the incident and more than two years after the giving of his discovery deposition. However, on the basic essential details pertaining to where the box was located, its size, weight and condition, its position upended on the batten of the vessel, the slipping of Otis Simmons' hook while he was "walking" the box around, and the manner of the weight of the box being thrown on libelant causing him to bend back severely, libelant and his witnesses, Otis Simmons and Cherryfield Butler, are in substantial agreement and their testimony is consistent.

Simmons testified that he found the box in the hatch when he went to work in the area. Its presence in the No. 1 Hatch is in conflict with the stowage plans and records of the vessel, but nevertheless the direct testimony of three witnesses is that it was there, and we believe the evidence preponderates in favor of a holding that Simmons was injured in moving a large, heavy and damaged box which was improperly stowed on the vessel by being upended against the batten at the time. Substantial corroboration of the basic essential facts testified to by libelant is found in the testimony of Otis Simmons and Cherryfield Butler. Butler was a member of the longshoremen's gang and observed the large box improperly stowed and heard it fall and went to libelant's assistance after the accident.

Both Simmons and his nephew were experienced longshoremen and the large box ordinarily could be straightened out and placed on the deck of the vessel without too much difficulty. Had it not been improperly stowed and not been in a damaged condition, the accident would not have occurred. The manner of handling the box by the two longshoremen was not unusual, and we find no fault on the part of libelant in so doing.

■ We hold, therefore, that the accident occurred in the manner described and that Simmons received disabling injuries as a result of the unseaworthy condition of the GULF TRADER due to improper stowage of the large box.

■ The warranty of seaworthiness applies to longshoremen who perform traditional duties of seamen aboard vessels because they are doing seaman's work and incurring a seaman's hazards. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). It is essentially a species of liability without fault limited by conceptions of negligence not contractual in character. Seas Shipping Co. v. Sieracki, supra. This obligation is nondelegable and the shipowner cannot contract it away by employment of an independent stevedore who is in control of loading and unloading the vessel. Petterson v. Alaska S. S. Co., 9 Cir., 1953, 205 F.2d 478, affirmed per curiam sub nom, Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). There is no doubt that the owner of a vessel is liable to a longshoreman who is injured because of unseaworthiness resulting from improper stowage of cargo. Reddick v. McAllister Lighterage Line, 2 Cir., 1958, 258 F.2d 297. Improper stowage of cargo is in violation of the Safety and Health Regulations for Longshoring (see Code of Federal Regulations, Title 29, § 1504.83(a) (b)),[7] and violation of such regulations binds both the shipowner and stevedore in damages for a longshoreman's injuries resulting therefrom. Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660.

■ The next question for determination is whether the shipowner is entitled

---

7. These regulations read as follows:
"§ 1504.83 Tiering and breaking down.
"(a) When necessary, cargo shall be secured or blocked to prevent its shifting or falling.

"(b) In breaking down, precautions shall be taken, when necessary, to prevent the remaining cargo from falling."

to indemnity from the stevedore, Smith. The vessel arrived in New Orleans on November 13, and so far as loading was concerned was in possession of the stevedore for a period of three days. Smith employees worked in Hatch No. 1 from 8:10 a. m. until 3:10 p. m. on November 13; from 6:00 p. m. until midnight on November 14; and from 1:00 a. m. until about 10:00 p. m. on November 15, the day of the accident. It was the duty of the stevedore who is experienced in such work to inspect the vessel and cargo stowed at previous ports, as well as cargo being stowed at New Orleans. The stevedore superintendent and foreman who had been in the hold for several days from time to time had reasonable opportunity to discover and report to the ship's officers or correct the improper stowage of the box. Its damaged condition and dangerous position upended against the batten were observed by several longshoremen, including Simmons, before the accident occurred. Smith, as contract stevedore, should have seen to it that the box was removed in a safe and workmanlike manner without injury to a longshoreman, and we find nothing in the conduct of the shipowner which would justify a holding of any act of negligence or fault on the part of the ship's officers.

As contract stevedore, Smith warranted to Gulf that all work aboard the SS GULF TRADER would be carried out in a safe, proper, prudent, workmanlike, and careful manner, and by its failure to do so, Smith is obligated to indemnify Gulf. Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Read v. United States, 3 Cir., 1953, 201 F.2d 758; and American President Lines v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753, cert. den., 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161 (1956).

It is not clear from the evidence where the box involved in the incident came from, nor do we know whether it was loaded at New Orleans or at previous ports. We do not believe, however, that it could have been resting upended on the batten on the voyage from Beaumont, Texas, to New Orleans. So its improper stowage must have occurred after the vessel reached New Orleans. Nevertheless, the unseaworthy condition of the vessel brought about by improper stowage of the box should have been corrected by the stevedore, who had ample time to do so, without injury to claimant.

Smith breached its warranty of workmanlike service in failing properly to inspect the area of the upper tween deck before cargo operations there commenced and to see to it that the longshoremen did not work until the dangerous condition had been removed or corrected. Hugev v. Dampskisaktieselskabet International, S.D.Cal., 1959, 170 F.Supp. 601, affirmed sub nom Metropolitan Steve. Co. v. Dampskisaktieselskabet Int., 9 Cir., 1960, 274 F.2d 875; United States v. Arrow Stevedoring Co., 9 Cir., 1949, 175 F.2d 329; Parenzan v. Iino Kaiun Kabushiki Kaisya, 2 Cir., 1958, 251 F.2d 928; Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397.

## QUANTUM OF DAMAGES

Simmons sustained a herniated intervertebral disc which Dr. Colclough, a neurosurgeon, removed by performing a lumbar laminectomy on February 28, 1962. Dr. Colclough believes that Simmons had a bad result from the operation and will be unable to resume his duties as a longshoreman.

Several other physicians examined claimant; for example, Dr. J. Kenneth Saer, an orthopedist, said on June 30, 1965 that he believed the patient would not be able to return to work as a longshoreman and that he had a permanent physical impairment of approximately 15–20%.

Dr. Richard H. Corales, Jr., a neurosurgeon, said on June 29, 1965 in his report that he felt that Simmons was disabled to return to work as a longshoreman at that time. He also said that the claimant had definite evidence of neurologic deficit. On October 17, 1963, he reported that the patient had not responded to any type of therapy and that

there were phases of the examination in which he was not certain that full co-operation had been obtained; however, that there seemed to be definite organic findings and it was his impression that Simmons presented evidence of nerve-root involvement.

Dr. Rufus H. Alldredge, orthopedist, reported on March 12, 1963 that there was no evidence of any serious findings of any kind but Simmons did not appear to have recovered or to be able to return to his regular work at that time.

Dr. Colclough in other reports said, for example, on February 25, 1963 that there were but two findings of objective na-true: a moderate degree of atrophy of the left lower extremity and an absent Achilles reflex on the left which were of objective nature, but all of the other complaints and other physical findings were subjective.

On September 28, 1962, Dr. Colclough reported that Simmons still had some stomach trouble and still had some trouble with his heart; that his diabetes had been well controlled.

Dr. Harry D. Morris, orthopedist, reported on August 15, 1962 that there were little cbjective physical findings associated with the patient's complaints. He also noted his diabetes which was reported also by Dr. Colclough in a report of March 12, 1962.

Simmons continues to have pain associated with his lower back as well as trouble with his heart and with his diabetes, though the latter seems to be controlled. It is doubtful that he will be able to resume his former employment as a longshoreman at any time in the future. He is a person of very limited education (up to the fifth or sixth grade). It is necessary that he take pain-relieving drugs for his current symptoms and there is no indication when this treatment will cease. At the time of his injury he was earning $5,000–$6,000 per year and was 40 years of age. Obviously he could not be expected to perform the hard work of a longshoreman to the end of his life had he not been injured. The presence of heart trouble and diabetes must also be taken into consideration. Considering all of the circumstances, the loss of past and future earnings, pain and suffering, we conclude that an award of $75,000 is proper; however, Smith is to be credited on the judgment to be rendered herein for all amounts it has paid to date.

Judgment will be entered, therefore, in accordance with this decree.

