**R. H. MANNING, Appellant,**

v.

**M/V "SEA ROAD", her engines, etc., and Sea Road Shipping Company, Inc., Appellees.**

**No. 24300.**

United States Court of Appeals
Fifth Circuit.

Oct. 16, 1969.

Arthur Roth, Miami, Fla., for appellant.

G. Morton Good, Miami, Fla., for appellees.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This is the second time around for these parties. This *in rem* libel by Longshoreman-strawboss Manning against the M/V Sea Road, owned by his employer, for *Yaka-Jackson* [1] recovery was heard and decided in the fall of 1964. After initial affirmance the judgment of the District Court was vacated on rehearing and the cause remanded. Manning v. M/V Sea Road, 5 Cir., 1965, 358 F.2d 615, 1966 A.M.C. 591. With great tenacity the case now comes before us again on the employee's appeal from a

1. Reed v. S. S. Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373; Jackson v. Lykes Bros. Steamship Co., 1967, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488, 1967 AMC 584.

final adverse judgment in the case on remand.

The question presented for our determination is whether Shipowner's violation of a safety regulation for longshoring which resulted in unseaworthiness of the vessel was the proximate cause of Manning's injury. We hold that it clearly was and send the case back for redetermination.

The facts of the case are simple. The Sea Road, a converted Navy World War II stern ramp loader (a landing craft type vessel used during the war for invasion purposes), is a small one-hold vessel, and is loaded by driving vehicles up the ramp into the hold. Her cargo space is long and narrow, approximately 62 feet by 20 feet beam. The cause in fact —although so far determined to be no cause in law—for this case was a manhole approximately 3 feet in diameter the outboard edge of which was about 2 or 3 feet from the starboard side plates and 10 to 20 feet from the square stern. The manhole cover had rusted so that it would not seat properly to support weight.

On an evening in September, 1963 the longshore crew of which Manning was the strawboss was loading a cargo of cement blocks stowed on pallets. The pallets were carried aboard the vessel by fork-lift and stowed four abreast athwartships from port to starboard. The pallet load was 4 feet wide and about 4 to 5 feet high. The fork-lift was 12 feet long and was maneuvered by its tiller-like single rear wheel.

Sometime between 6:00 and 7:00 p. m. a longshoreman, with the unlikely name Sam Smith, stepped on the manhole cover but the rim was wasted away and Smith fell into the hole.

Fred Craft, one of the owners of the employer company and of M/V Sea Road, investigated the accident and went to find some plywood to provide a temporary cover, but he gave up on that sometime between the time Smith was injured and 8:00 p. m.

Sometime about 8:00 o'clock Manning was walking backwards directing a fork-lift over the ramp along the starboard side in the hold to fill out a line of pallets. There were three pallets stowed abreast and this load was to fit in the space of 4½ to 5 feet remaining on the starboard side. There was approximately 15 to 20 feet between the forward lip of the manhole and the after side of the cargo. As he was holding the cement blocks, he stepped backwards onto the replaced rusted-rimmed manhole cover and fell into the manhole—obviously a misnomer because it is a hole where men don't really belong. As a result of the fall Manning injured his left knee.

On the initial trial Shipowner conceded, with no real concession at all, that the defective manhole cover rendered M/V Sea Road unseaworthy. It took the bold course, which so far has maintained its buoyancy, that the whole thing was due to the flagrant carelessness of Manning so that the misfortune of the 100 percent contributorily negligent Manning was not proximately caused by this flagrant unseaworthiness.

This was the conclusion of the Trial Judge. It was based upon a permissible credibility choice, 52(a) F.R.Civ.P., that Manning knew of Sam Smith's earlier injury and management's abortive efforts toward temporary repair.

On the first appeal this Court affirmed the finding that Manning knew of the accident and of the unseaworthy condition on the basis that it was not clearly erroneous. The Court affirmed the finding that Manning was negligent in that there was a safe route available and there was more than mere knowledge on Manning's part of the unseaworthy condition. After pointing out that assumption of risk concepts could not be applied to defeat recovery and that mitigation of damages for contributory negligence was the most that could result, we distinguished one case on the ground that "there was no alternative safe route available and the court specifically noted that this might have given rise to a contributory negligence situation." We

then went on to characterize the instant case.

"Here there was a safe route available, and there was more than mere knowledge of the unseaworthy condition. The employee was a part of management and was supervising the loading operation, and it is a fair inference that he could have avoided the danger by discontinuing the work, relocating it, or going around the danger." 358 F.2d at 617.

This had led us earlier to declare in quite sweeping terms that the Governmental Safety Regulations for Longshoring did not change the result because, essentially, they were not applicable.[2] We phrased it this way:

"It is not clear that the safety regulation was called to the attention of the District Court; however, we do not think that it precludes the decision of the court. It is not geared to a situation such as was presented here where the seaworthiness went only to a small portion of the vessel. The regulation calls for a work stoppage only when the unseaworthy condition would jeop-

ardize the safety of employees. Here the work could go on provided the longshoremen steered clear of the defective cover. The regulation was not applicable under the facts presented." 358 F.2d at 617.

But all of this was markedly changed on rehearing and it is the fact that this was not discerned or we did not make ourselves clear that led to the error on remand. No longer adhering to the rigid reading of the Regulation that it applied only where the condition would jeopardize safety rather than the risk of likely injury or to the declaration that here "the work could go on provided the longshoremen steered clear of the * * * cover," we announced this change of judicial heart: "Moreover, upon further consideration of the documentary evidence, it is not clear that the work could have safely proceeded in spite of the defective manhole cover." 358 F.2d at 618.[3]

Although charged by our mandate for full judicial-evidentiary inquiry into the Regulations,[4] the District Judge reduced

---

2. The Regulation there and here stressed was Title 29, CFR, Subtitle A, Part 9, Subpart D, Working Surfaces § 9.31(c), which provides:

  "(c) Missing, broken, split, or poorly fitting hatch covers that would jeopardize the safety of employees shall be reported at once to the officers in charge of the vessel. Pending replacement or repairs by the vessel, work shall not be performed in the section containing the unsafe covers or in adjacent sections unless the flooring is made safe."

  Now 29 C.F.R. § 1504.31(c).

  We point out other relevant regulations, *infra* Notes 6 and 7.

3. This was preceded by:

  "The petition for rehearing is granted in part. Among other grounds for rehearing urged by appellant is the contention that both the District Court and this court failed to give due weight to the Safety Regulation, Title 29, CFR, Subtitle A, Part 9, Subpart D, Working Surfaces, § 9.31(c) promulgated under The Longshoremen's Safety Act, 33 U.S.C.A. § 941(a). See Footnote 1 of original opinion for text of regulation.

  We concluded in the original opinion that this Safety Regulation played a minor role, if any, in the trial. We deemed it inapplicable on the reasoning that the unseaworthiness in question applied to only a small portion of the vessel, and the work could have proceeded without jeopardizing the safety of the employees.

  It is now agreed that the regulation was called to the attention of the District Court after the evidentiary hearing but prior to the entry of findings of fact and conclusions of law. There is no reference whatever to the regulation in the findings and conclusions." 358 F.2d at 618.

4. "Proper judicial administration and the ends of justice under the circumstances dictate that the District Court should first make findings and conclusions on the applicability of the Safety Regulation, whether it was violated, and if so, its relation, if any, to the proximate cause of the injury sustained by appellant. The cause will be remanded so that this may be done. The District Court may do this on the present record, or in its discretion, on the present rec-

the whole thing to a very simple fact question:

"Did [Manning] have another available route or course to direct that fork lift in?"

To which he supplied a ready answer:

"If he did and didn't take it, the safety regulation is not applicable and couldn't possibly have been the proximate cause of his injury."[5]

■ There are several things wrong with this conclusion. First, it misread our mandate. Second, declaring that this choice of unsafe over safe route "precluded recovery" (note 5, *supra*) brought back into the case assumption of risk concepts that we had declared to be proscribed. (see 358 F.2d at 617). Third, this was an erroneous view of the law. Contributory negligence is more than an inquiry into safe versus unsafe routes. It is doubly so where comparative fault ameliorates this type of misconduct. This greatly simplifies our task, for fact, or fact-legal, conclusions induced by an erroneuos legal standard do not have the F.R.Civ.P. 52(a) clearly erroneous insulation. United States v. Singer Mfg. Co., 1963, 374 U.S. 174 (note 9, page 194), 83 S.Ct. 1773, 1784, 10 L.Ed. 2d 823, 838; Fulton National Bank v. Tate, 5 Cir., 1966, 363 F.2d 562; Fromberg, Inc. v. Thornhill, 5 Cir., 1963, 315 F.2d 407; Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489; MacMullen v. South Carolina Elec. and Gas Co., 4 Cir., 1963, 312 F.2d 662, cert. denied 373 U.S. 912, 83 S.Ct. 1302, 10 L.Ed.2d 413.

We must, therefore, examine what this record demands concerning the regulations, and the significance of any violation.

■ There can be no doubt that the Regulations are applicable in a general sense. They bind all employers, such as shipowner here, of longshoring employees. And, promulgated by the Department of Labor with their genesis in the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., imposing stringent sanctions, civil and criminal, they are geared directly to the safety of men, safety of working conditions, elimination of hazards that have long made longshoring one of industry's most crippling vocations.[6]

---

ord and any other evidence that may be adduced on the question. See Peerless Insurance Company v. Bailey Mortgage Company, 5 Cir., 1965, 345 F.2d 14." 358 F.2d at 618.

5. From post-remand hearing colloquy on the conclusion of evidence (R276–77) the Judge's reactions, leading shortly to a decree for Shipowner, continued:

The "Court [of Appeals] has said, as I construe the mandate for me to take further evidence to determine whether another available route, another route was available to Manning, if it was, and he selected one over the manhole, he is precluded from recovery. It is just that simple." R. 277

6. These are Part 1504, Safety and Health Regulations for Longshoring, 29 C.F.R. § 1504.1, et seq.

"§ 1504.1 Purpose and authority.

(a) The Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424; 33 U.S.C. 901 et seq.) provides compensation for injuries suffered by employees when they are working for private employers within the Federal maritime jurisdiction on the navigable waters of the United States, including dry docks. Public Law 85–742, 72 Stat. 835, approved August 23, 1958, which amends section 41 of the Longshoremen's and Harbor Workers' Compensation Act, as amended (44 Stat. 1444; 33 U.S.C. 941) requires, among other things, that every employer of the aforementioned employees 'shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees.' It is the purpose of the regulations of this part to carry out the the intent of Public Law 85–742."

"§ 1504.2 Scope and responsibility.

(a) The responsibility for compliance with the regulations of this part is

This brings into play Marshall v. Isthmian Lines, Inc., 5 Cir., 1964, 334 F.2d 131, 1964 A.M.C. 1686, which dealt with regulations issued by the Coast Guard under 46 U.S.C.A. § 170(7). The applicability and impact of regulations was summed up this way:

"The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself. Prosser, Torts § 34, at 161 (2d ed. 1955); Restatement, Torts § 286 (1934). Inherent in this statement of the legal principle are three questions which must be resolved before liability could be imposed * * * on a negligence per se theory. What proof makes out a violation of the regulations? Were the regulations designed to protect longshoremen? Were they intended to protect against the risk of the kind of harm that occurred here * * * ?" 334 F.2d at 134.

But, unlike *Marshall*, where we held that although Longshoremen were within the class of intended beneficiaries, the Regulation was not designed to protect against the kind of hazard there encountered, it is plain here that both the specific regulation [7] asserted and the

---

placed upon 'employers' as defined in § 1504.3(c) of this part."

\* \* \* \* \* \*

"§ 1504.3 Definitions.

\* \* \* \* \* \*

"(c) The term 'employer' means an employer any of whose employees are employed, in whole or in part, in longshoring operations or related employments, as defined herein within the Federal maritime jurisdiction on the navigable waters of the United States."

\* \* \* \* \* \*

"§ 1504.4 Penalty.

As provided in Public Law 85–742, any employer who, willfully, violates or fails or refuses to comply with the provisions of the regulations of this part, and any employer or other person who willfully interferes with, hinders, or delays the Secretary or his authorized representative in carrying out his duties under subsection (c) of section 41 of the Act by refusing to admit the Secretary or his authorized representative to any place, or to permit the inspection or examination of any employment or place of employment, or who willfully hinders, or delays the Secretary or his authorized representative in the performance of his duties in the enforcement of the regulations of this part, shall be guilty of an offense, and, upon conviction thereof, shall be punished for each offense by a fine of not less than $100 nor more than $3,000; and in any case where such employer is a corporation, the officer who willfully permits any such violation to occur shall be guilty of an offense, and, upon conviction thereof, shall be punished also for each offense by a fine of not less than $100 nor more than $3,000.

The liability under this provision of Public Law 85–742 shall not affect any other liability of the employer under the Longshoremen's and Harbor Workers' Compensation Act."

29 C.F.R. §§ 1504.1, .2, .3, .4.

The congressional intent in the enactment of the Longshoring Safety Regulations is set forth in House Rep. No. 2287, 85th Cong., 2d Sess., July 28, 1958, by the Committee on Education and Labor:

"The purpose of H.R. 13021 is to amend section 41 of the Longshoremen's and Harbor Workers' Compensation Act so as to provide a system of safety rules, regulations, and safety inspection and training, and authorize their enforcement by the Secretary of Labor. It is designed to bring about a greater degree of safety in the industry and reduce the very high rate of injury which at the present time is approximately seven times higher than the injury rate in manufacturing activities." U.S.Code Cong. & Admin.News 1958, pp. 3843, 3844.

See 33 U.S.C.A. § 941 and the regulations promulgated thereunder, 29 C.F.R. Part 1504, *supra* and note 7, *infra*.

7. See note 2, *supra*. We think a number of other regulations bear directly on the hazard of open or improperly covered holes in deck spaces where the opening is not required for current cargo operations as well as on the use of equipment such as fork lifts. See, e. g.,

"§ 1504.35 Open hatches.

Open weather deck hatches around which longshoremen must work which are not protected to a height of 24 inches by coamings, shall be guarded by taut lines at a height of 36 to 42 inches above the deck except on the side on

whole statutory-regulatory structure are aimed directly at avoiding personal injuries from hazardous conditions. On accepted principles violation of these safety regulations constitutes negligence *per se*.[8]

We need not pause long over violation of the specific or related regulations (see notes 6 and 7, *supra*). Longshoring is a hazardous business. It will always be so. Part of the hazard comes from unavoidable necessity of working around tween deck hatch openings or the edge of built-up deck cargoes during loading or discharging operations. But the risk of falling into or through deck openings which are not essential to current operations is one the regulations sought to stamp out. Everywhere the regulations recognize the risk from openings in holds, decks or hatches and undertake to eliminate or minimize it. Everywhere there is a requirement for suitable stanchions, guard rails or life lines (see note 7, *supra*). This is a recognition of experience-proved results that these are dangers having devastating consequences to life and limb even to those who, from working in the area, are bound to know of them.

█ All of this has a powerful bearing on causation. The aim of Congress in this legislation and the regulations carrying Congressional imprimatur is to prevent the risk of injury. The regulations forbid the employer to do or not do the thing specified. Severe administrative, civil and criminal sanctions are imposed to eliminate the conditions prohibited. The burden is on the employer, not the employee. The aim of the structure is to eliminate the risk of injury to all longshoremen, not just longshoremen who are 100%-plus prudent. Any notion that a flagrant violation of a regulation by the employer shifts the whole loss onto the victim would thwart the entire objective of Congress. Unless an employer bears a considerable portion of the loss, the sought after safety will not be achieved. Indeed, this case illustrates the irony of a holding that the more flagrant the violation the less money risk the employer runs.

█ On the specifics of this record, violation is plain. Granted that there

---

which cargo is being worked. Any portable stanchions or uprights used shall be so supported or secured as to prevent accident dislodgement; *Provided, however,* That the requirements of this section shall not be deemed to apply to barges or to Great Lakes type bulk carriers.

§ 1504.36 Weather deck rails.

Removable weather deck railings shall be kept in place except when cargo operations require them to be removed, in which case they shall be replaced as soon as such cargo operations are completed."

"§ 1504.31 Hatch coverings.

\* \* \* \* \* \*

"(e) Small trimming hatches located in intermediate decks shall be adequately covered or guarded while work is proceeding in the hatch in which they are located, unless they are actually in use."

"§ 1504.32 Stowed cargo and temporary landing platforms.

\* \* \* \* \* \*

"(b) When an edge of a hatch section or of stowed cargo more than 8 feet high is so exposed that it presents a

danger of persons falling, the edge shall be guarded by a line, safety net or railing."

\* \* \* \* \* \*

"§ 1504.3 Definitions.

"(q) The term 'small trimming hatch' means a small hatch or opening, pierced in the tween deck or other intermediate deck of a vessel and *intended* for the trimming of dry bulk cargoes. It does not refer to the large hatchways through which cargo is normally handled."

§ 1504.13 requires a certificate of fitness for all shore-based equipment including cranes and fork lifts.

See 1504.3(r):

"(1) The term 'crane' means a mechanical device intended for lifting or lowering a load and moving it horizontally, in which the hoisting mechanism is an integral part of the machine. A crane may be a fixed or mobile machine."

See also 1504.73(b) covering safety equipment on fork lifts.

8. See Marshall v. Isthmian Lines, Inc., *supra*, at 134.

was deck space over which Manning could have guided the fork lift to avoid his letting the fork lift and himself get too close to the manhole, this is not the whole answer. The fork lift filled up 12 feet of the 20 foot interval. The pallet had to be spotted in a space little wider than the pallet. The operation was a continuous movement in close quarters calling for some direction by Manning. Congress meant to protect workers against injuries, many of which occur in an industrial surrounding of momentary thoughtlessness, imprudence or carelessness. This was a hole in a deck surface over and on which men were working but which did not have to be uncovered for operations. The risk was that of stepping or falling into the hole. The means to avoid it was a secure cover, stanchions, or suspension of work until repairs had been made. The risk became a fact. The resulting fact was directly due to a violation by shipowner so flagrant that even its counsel could not defend it. What could not—the word is *could not*—have occurred without breach of the regulation by the employer surely must meet all the tests anyone has ever contrived—metaphysical or otherwise— on legal causation.[9]

■■■ This conclusion is not a departure from either our former decision or the rule of the law of the case.[10] On

9. The inquiry starts from the position that unless an action is a cause in fact of an injury it cannot be a proximate (sometimes called "legal") cause. Prosser says that "an act or an omission is not regarded as a cause [in fact] of an event if the particular event would have occurred without it." Prosser, Law of Torts 242 (3d ed. 1964). Noting that this rule does not cover all situations, Prosser espouses the broader rule, which has found general acceptance: "The defendant's conduct is a cause [in fact] of the event if it was a material element and a substantial factor in bringing it about." Prosser, *supra* at 244.

While cause in fact is readily definable, legal, proximate cause does not lend itself so readily to scientific explication. The Restatement (Second) of Torts says the "words 'legal cause' are used * * * to denote the facts that the causal sequence by which the actor's tortious conduct has resulted in an invasion of some legally protected interest of another is such that the law holds the actor responsible for such harm unless there is some defense to liability." Restatement (Second) of Torts 16 1965.

On this approach the maritime rule of comparative fault has some bearing. For what would in a contributory-negligence-as-a-bar jurisdiction constitute a "defense" as the Restatement phrases it, works in a comparative fault jurisdiction as mitigation of damages and not ordinarily as an element of liability in terms of causation.

Prosser also uses legal cause in policy terms. He says that legal cause "is sometimes said to be a question of whether the conduct has been so significant and important a cause that the defendant

should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that this becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser, *supra* at 282.

Of course on policy considerations maritime law, long before these regulations of like aim, with its ever expanding concern for the safety of real and *Sieracki* seamen, recognized comparative fault principles as an effective instrument in that objective. Of it the court had this to say in the old case of The Steamer Max Morris v. Curry, 1890, 137 U.S. 1, 11 S. Ct. 29, 34 L.Ed. 586: "the more equal distribution of justice, the dictates of humanity, the safety of life and limb, and the public good, will be best promoted by holding vessels liable to bear some part of the actual pecuniary loss sustained by the libelant * * *." 137 U.S. at 14, 11 S.Ct. at 33, 34 L.Ed. at 589. See Kernan v. American Dredging Co., 1957, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382.

10. Although "the law of the case doctrine 'is not an inexorable command,' " Wm. G. Roe & Co. v. Armour & Co., 5 Cir., 1969, 414 F.2d 862 quoting from White v. Murtha, 5 Cir., 1967, 377 F.2d 428, 431, and we recognize that this Court "must be free to determine whether the first decision was in error, if so, whether a different result should be reached," Wm. G. Roe & Co. v. Armour & Co., supra; see also Beaudine v. United States, 5 Cir., 1969, 414 F.2d 397; Lincoln National Life Insurance Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110 (en banc), cert. denied, 1963, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720; Seagraves v. Wallace,

the contrary, by our former decision the court recognized that the applicability and significance of the regulations called for further judicial inquiry, evaluation and determination. It was another way of saying that on that record and in that posture the court was not able with requisite assurance to rule as a matter of law that the trial court's conclusions were acceptable. By the plain terms of the mandate (see note 4, *supra*) a further trial was contemplated and by the nature of the court's doubts leading to the remand, it equally contemplated an appeal anew on the remanded issues. What—and all—we have done is just that.

With this conclusion on causation all else falls. We make these further comments because of a basic misconception running through Shipowner's briefs. It stresses and restresses that this action is a libel *in rem* and that consequently violation of the regulations is of no significance since this would constitute negligence for which a shipowner-employer is not liable, and certainly not in a libel

*in rem*. There are a number of things wrong with that approach.

At the outset, if there is unseaworthiness, it no longer matters whether the claim is asserted *in rem* or *in personam*. By *Jackson* (note 1, *supra*) the shipowner-employer has a *Yaka* liability in both forms of action.

And from a substantive point of view Shipowner misconceives the significance of the violation of the regulations. True, violation here is negligence, and negligence for which the employer is not liable because of the exclusive liability provision of the Longshoremen's Act, 33 U.S.C.A. § 905. But what Shipowner overlooks is that the negligent violation of the regulations simultaneously makes the vessel unseaworthy. The Fourth Circuit has expounded this forcefully in *Provenza*,[11] an opinion we approved in *Marshall* supra, at 135 and n.9, as have others[12] expressly or by implication.

---

5 Cir., 1934, 69 F.2d 163, cert. denied, 1934, 293 U.S. 569, 55 S.Ct. 80, 79 L.Ed. 668, we have for the purposes of this case accepted what was determined in the prior appeal and determined anew only that which the remand left open. It is this Court's firm practice that one panel cannot overrule another panel's decision. This may be done only by the Court en banc. We emphasize that in keeping with that principle this panel has been faithful to the prior panel's decision.

11. Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660, 1964 A.M.C. 2279, cert. denied, 1964, 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971.

"Nevertheless, if the violation of the regulations by the stevedore created a dangerous condition then the law is clear that the shipowner is in turn also liable, even if he did not know of the dangerous situation created by the stevedore, for that is the nature of the owner's duty of seaworthiness. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

\* \* \* \* \* \*

"Furthermore, we are also forced to the conclusion that in the area covered by the regulations their violation would render the ship unseaworthy, and if such unseaworthiness was the proxi-

mate cause of the plaintiff's injury, it would also render the defendant shipowner liable. \* \* \*

"Prior to the enactment of 33 U.S.C.A. § 941 and the promulgations of the regulations thereunder what constituted negligence or unseaworthiness was to be determined by the jury under the definitions laid down by the courts. Now, with respect to longshoring, the statute law of the United States has laid down definite standards \* \* \*." 324 F.2d at 665.

12. Among others see Judge Ainsworth's (then a district judge) opinion in Simmons v. Gulf and South American S. S. Co., E.D.La., 1966, 260 F.Supp. 525, 1967 A.M.C. 29, aff'd 5 Cir., 1968, 394 F.2d 504, 1968 A.M.C. 1978.

"There is no doubt that the owner of a vessel is liable to a longshoreman who is injured because of unseaworthiness resulting from improper stowage of cargo. Reddick v. McAllister Lighterage Line, 2 Cir., 1958, 258 F.2d 297. Improper stowage of cargo is in violation of the Safety and Health Regulations for Longshoring (see Code of Federal Regulations, Title 29, § 1504.83(a)(b)), and violation of such regulations binds both the shipowner and stevedore in damages for a longshoreman's in-

If negligence arising from breach of the regulations by an independent stevedore's creating a condition can make the vessel unseaworthy,[13] then it is doubly so where the violator is both the employer and the owner of the vessel. All the more is it so when, on general principles so well recognized that even knowledgeable salt water counsel could find no basis for contending otherwise, Shipowner conceded and the Court found the vessel unseaworthy for this defective cover. Violation of the statutory regulations only makes it worse since this brings into play congressional objectives which, as we have discussed, bear on causation.

Thus the case must go back again for proper evaluation in terms of mitigation in the light of the policies we have outlined. Obviously the reduction cannot be 100%. The share to be borne by the Shipowner-employer must be substantial to effectuate these policies. (See The Max Morris, note 9 supra). Hopefully the travail of two trials and two appeals, with the unlikelihood that this small case can generate more problems worthy of a third appeal will lead the parties to find a way to bring this case to an end before it takes its place alongside some other persistent one. *E. g.*, Wil-

liams v. United States, 5 Cir., 1968, 405 F.2d 234; 1967, 379 F.2d 719; 1965, 352 F.2d 477. Oil Screw Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1963, 322 F.2d 3, 1964 A.M.C. 59; 1961, 292 F.2d 437, 1961 A.M.C. 1641.

Reversed and remanded.

---

juries resulting therefrom. Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660."
260 F.Supp. at 528.
See also Reid v. Quebec Paper Sales & Transportation Co., S.D.N.Y., 1964, 1964 A.M.C. 1715, 1718, aff'd. 2d Cir. 1965, 340 F.2d 34, 35; Lunsford v. Bethlehem Steel Corp., D.Md., 1967, 269 F. Supp. 570, 1967 A.M.C. 1775; Meyer v. United States, S.D.N.Y., 1966, 254 F. Supp. 873, 875, 1967 A.M.C. 631.
Many other cases have been concerned with the regulations, violations, and their effects. See Dugas v. Nippon Yusen Kaisha, 5 Cir., 1967, 378 F.2d 271, 1967 A.M.C. 2090; D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 1966 A.M.C. 2223; Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 1961 A.M.C. 1651; Logan v. Empressa Lineas Maritimas Argentinas, 1 Cir., 1965, 353 F.2d 373; Denaro v. United States, 2 Cir., 1964, 337 F.2d 275, 1964 A.M.C. 2738; Albanese v. N. V. Nederl. Amerik Stoom v. Maats., 2 Cir., 1965, 346 F.2d 481, rev'd, 382 U.S.

283, 86 S.Ct. 429, 15 L.Ed.2d 327; Deffes v. Federal Barge Lines, Inc., E.D.La., 1964, 229 F.Supp. 719, rev'd, 5 Cir., 1966, 361 F.2d 422; Shannon v. S/S Ulua, E.D.La., 1968, 285 F.Supp. 16; McKinney v. United States, W.D.Wash., 1965, 255 F.Supp. 714, aff'd, 9 Cir., 1966, 368 F.2d 542; United States v. Gibbs Corp., S.D.Fla., 1962, 204 F.Supp. 705; Ray v. Compania Naviera Continental, S.A., D.Md., 1962, 203 F.Supp. 206; Flores v. Pacific Island Trans. Lines, 248 Cal.App.2d 812, 57 Cal.Rptr. 73, 1967 A.M.C. 1245; Sea-Land Serv., Inc. v. Matson Terminal Co., 253 Cal.App.2d 885, 61 Cal.Rptr. 756, 1967 A.M.C. 1758.

13. We have no problem here of "instant unseaworthiness". See Grigsby v. Coastal Marine Serv., 5 Cir., 1969, 412 F.2d 1011, 1032 and note 42. See also Luckenbach Overseas Corp. v. Usner, 5 Cir., 1969, 413 F.2d 984; Wilson v. Societa Italiana de Armamento, 5 Cir., 1969, 409 F.2d 484; Duncan v. Transeastern Shipping Corp., 5 Cir., 1969, 413 F.2d 1023.